STATE OF CONNECTICUT *v.*
CHRISTOPHER THERRIEN
(AC 29505)

Flynn, C. J., and Beach and Borden, Js.

Argued April 14—officially released September 22, 2009

*Jeffrey C. Kestenband,* for the appellant (defendant).

*Timothy J. Sugrue,* senior assistant state's attorney, with whom, on the brief, were *Gail P. Hardy,* state's attorney, and *Anthony Bochicchio,* senior assistant state's attorney, for the appellee (state).

*Opinion*

BORDEN, J. The defendant, Christopher Therrien, appeals from the judgment of conviction, rendered after a jury trial, of harassment in the second degree in violation of General Statutes § 53a-183 (a) (3) and threatening in the second degree in violation of General Statutes § 53a-62 (a) (2). The defendant claims that (1) the trial court improperly denied his motion to dismiss filed pursuant to *Franks* v. *Delaware,* 438 U.S. 154, 98 S. Ct. 2674, 57 L. Ed. 2d 667 (1978), (2) the court improperly admitted evidence from the sentencing proceedings of his codefendants and (3) the prosecutor committed improprieties that deprived him of his due process right to a fair trial. We agree with the defendant's claim of prosecutorial impropriety and, therefore, reverse the conviction on both counts and remand the case for a new trial. We also address the merits of the defendant's first two claims because they are likely to arise on retrial.

The defendant was charged with witness intimidation in violation of General Statutes § 53a-151a (a) (2), harassment in the second degree in violation of § 53a-183 (a) (3) and threatening in the second degree in violation of § 53a-62 (a) (2). Prior to the trial, the defendant moved to dismiss all of the charges on the ground that the arrest warrant affidavit lacked probable cause. After a hearing, the court denied the defendant's motion. The jury thereafter found the defendant guilty

of harassment in the second degree and threatening in the second degree,[1] and the court rendered judgment accordingly. This appeal followed.

The jury reasonably could have found the following facts. In July, 2006, Daniel Candella, the victim, was assaulted and robbed by several individuals in Lafayette Park in the Thompsonville section of Enfield. Three persons, the defendant, Joseph O'Hagen and a youthful offender, subsequently were arrested and convicted for their participation in the crime. O'Hagen was sentenced on February 2, 2007, and the youthful offender was sentenced on July 19, 2007, on criminal charges relating to their involvement in the Lafayette Park incident. The defendant was scheduled to be sentenced on August 9, 2007, on criminal charges pertaining to his involvement in the same incident.

At the sentencing proceedings for O'Hagen and for the youthful offender, Candella and his mother each appeared and spoke against the defendants. On at least one of these occasions, Candella cried and visibly was upset.

On July 27, 2007, eight days after the youthful offender's sentencing and twelve days before the defendant's scheduled sentencing proceedings, Candella received a telephone call, at approximately 7:45 p.m., on his cellular telephone while working at his place of employment. Candella's cellular telephone did not display the caller's telephone number and only indicated that it was a "private caller." Although he did not know who was calling him, Candella answered the telephone call. The caller was Andrew Polowitzer. Candella previously had worked with Polowitzer at a Panera Bread store and, in 2006, lived in Polowitzer's apartment for one

---

[1] The jury was unable to reach a unanimous verdict regarding the witness intimidation charge. The court thereafter ordered a mistrial on that count, and the state entered a nolle prosequi as to that charge.

day. Polowitzer threatened Candella, stating that he and his brother were in trouble and were "going to die." The telephone, from which Polowitzer was speaking, was then given to Shane Connors, who identified himself and threatened to kill Candella and his family. At the time of the telephone call, Connors was a roommate of Polowitzer and had worked with Candella at the Panera Bread store.

The telephone was then "passed" to a third caller, whose voice Candella did not recognize. This individual said that Candella had been "a little bitch" during a court proceeding at which Candella had cried, and he threatened to "slit [Candella's mother's] stomach, take a piss on her . . . while [Candella's] father was watching and kill [Candella's] dog . . . ." When Candella challenged the third caller to reveal himself, the third caller identified himself as "Chris, who kicked [your] ass at the park."

Joann Malone was working with Candella when he received the telephone call. Candella left the room to take the call. Although the door was shut, Malone could hear Candella talking loudly outside the door. About one minute later, Candella returned to the room, screaming. He put his cellular telephone to Malone's ear, and she heard an unknown voice threaten to kill Candella and his family. Candella ended the telephone call and immediately dialed 911. He was instructed to go to the East Windsor police department.

Sergeant Michael R. Poliquin was dispatched from the road to meet Candella at the police station. When Poliquin arrived at the police station, he saw Candella, who was hysterical, crying and agitated, in the lobby area speaking on his cellular telephone. Poliquin took Candella's cellular telephone and introduced himself to the individual on the line. After a brief pause, the individual identified himself as Polowitzer. Poliquin

spoke with Polowitzer briefly before ending the telephone call. Connors then called the police station and spoke with Poliquin. Thereafter, both Polowitzer and Connors voluntarily came to the police station and were interviewed by Officer Darren Seligman. Polowitzer and Connors told the police that the call pertained to a $200 rent debt that Candella owed to Polowitzer, which had been discussed during the initial telephone call to Candella.

On August 10, 2007, the defendant was arraigned in the Superior Court in Enfield. Supervisory judicial marshal John Maloney was on duty in the courthouse that day. After seeing the defendant in court, Maloney saw him again and heard the defendant say, "I make one phone call and it gets all crazy."

I

The defendant first claims that the court improperly denied his motion to dismiss pursuant to *Franks* v. *Delaware*, supra, 438 U.S. 154. The defendant claims that his conviction should be reversed because the "court should have granted his *Franks* motion and dismissed the charges" against him. This claim requires little discussion.

Prior to the commencement of the trial, the defendant moved for an evidentiary hearing in accordance with *Franks* v. *Delaware*, supra, 438 U.S. 154. The motion contained twelve challenges to the arrest warrant affidavit, three allegedly material falsehoods and nine allegedly material omissions. The court gave the defendant the opportunity to make an offer of proof, which he did through the testimony of Poliquin, Seligman and the defendant's father. The defendant then argued five of his twelve challenges. Neither in the trial court nor in this court has the defendant challenged the admissibility of any evidence gathered as a result of the warrant; indeed, he could not do so because there was no such

evidence. The state rebutted the defendant's arguments on their merits, and the court thereafter denied the defendant's motion for a *Franks* hearing and declined to dismiss the charges.

"In *Franks* v. *Delaware,* supra, [438 U.S.] 155–56, the United States Supreme Court held that where the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the [f]ourth [a]mendment requires that a hearing be held at the defendant's request. . . . The court in *Franks* mentioned only a false statement . . . included . . . in the warrant affidavit; subsequent cases, however, have extended *Franks* to include material omissions from such an affidavit." (Internal quotation marks omitted.) *State* v. *Grant,* 286 Conn. 499, 519–20, 944 A.2d 947, cert. denied, 555 U.S. 916, 129 S. Ct. 271, 172 L. Ed. 2d 200 (2008). If the ensuing *Franks* hearing discloses either an intentional or reckless falsehood, the court must excise that material from the affidavit and judge the probable cause of the affidavit shorn of that material. *Franks* v. *Delaware,* supra, 171–72.

Our Supreme Court has long held that an illegal arrest does not deprive the court of personal jurisdiction over the defendant and, therefore, that it does not provide a valid basis for a motion to dismiss. See, e.g., *State* v. *Fleming,* 198 Conn. 255, 259–63, 502 A.2d 886, cert. denied, 475 U.S. 1143, 106 S. Ct. 1797, 90 L. Ed. 2d 342 (1986). The same principle applies in the context of a claimed *Franks* violation; the remedy for an arrest on the basis of an insufficient warrant is the suppression of any evidence obtained thereby. "A *Franks* violation in an affidavit supporting an arrest warrant does not entitle a defendant to the dismissal of the charges for which he was arrested. Such a violation may require

the suppression of evidence or statements obtained as a result of the execution of the warrant but it does not deprive the court of jurisdiction nor does it bar a subsequent prosecution or void a resulting conviction." *State* v. *Patterson*, 213 Conn. 708, 715–16, 570 A.2d 174 (1990). Because the defendant did not seek to suppress any evidence gathered as a result of the arrest warrant and limited his claim to dismissal of the charges, the court, by even entertaining his motion to dismiss on the basis of an alleged *Franks* violation, afforded him more process than he was due.

We reject the defendant's contention that the *Fleming* principle does not apply when, as in the present case, the defendant seeks to invalidate the arrest warrant on what he terms as the substantive ground of lack of probable cause. *State* v. *Patterson*, supra, 213 Conn. 714–16, answers that contention, because, in that case, the defendant sought dismissal of the prosecution on the ground that the warrant, when tested under *Franks*, lacked probable cause.

## II

The defendant next claims that the court improperly admitted evidence of Candella's involvement in the sentencing proceedings of O'Hagen and the youthful offender to prove that the defendant had a motive to threaten Candella. The defendant claims that the court abused its discretion in admitting such evidence because the state failed to lay a foundation that he had knowledge of Candella's involvement in those proceedings. We disagree.

"A trial court's ruling on the admissibility of evidence is afforded great deference. . . . The trial court has wide discretion to determine the relevancy of evidence and the scope of cross-examination. Every reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has

been an abuse of discretion." (Internal quotation marks omitted.) *State* v. *Morgan*, 70 Conn. App. 255, 263, 797 A.2d 616, cert. denied, 261 Conn. 919, 806 A.2d 1056 (2002).

"It is well settled that [t]he proffering party bears the burden of establishing the relevance of the offered [evidence]. Unless such a proper foundation is established, the evidence . . . is irrelevant. . . . We have often stated that [e]vidence is admissible when it tends to establish a fact in issue or to corroborate other direct evidence in the case. . . . One fact is relevant to another fact whenever, according to the common course of events, the existence of the one, taken alone or in connection with other facts, renders the existence of the other either certain or more probable." (Citation omitted; internal quotation marks omitted.) Id. "Evidence is irrelevant if there is such a want of open and visible connection between the evidentiary and principal facts that, all things considered, the former is not worthy or safe to be admitted in the proof of the latter." (Internal quotation marks omitted.) *State* v. *Liborio A.*, 93 Conn. App. 279, 288, 889 A.2d 821 (2006).

Prior to the commencement of evidence in the defendant's trial, a hearing was held regarding the state's notice of intent to offer evidence of prior misconduct relating to the defendant's involvement in the Lafayette Park incident as relevant to show the defendant's intent, identity and motive. Although it is unclear from the record whether the state's proffer at this point included evidence relating to the sentencing hearings of O'Hagen and the youthful offender, the defendant argued that the prior misconduct evidence would be inadmissible absent specific proof that the defendant knew what happened at the sentencing hearings. The court characterized the state's offer as encompassing "evidence related to [the defendant's] involvement in a robbery

of [Candella] and evidence related to the legal proceedings, to wit, the conviction and sentencing hearing of [the defendant] for the crime involving [Candella]," and admitted the evidence for the limited purposes of showing the defendant's intent, identity and motive and as proof of an element of the crime of intimidating a witness.

Candella testified that the defendant told him, during the telephone call, that Candella "was a little bitch in court when [he] went to someone's court trial and that [he] was crying there." Candella testified that the defendant then said that he was "going to slit [Candella's mother's] stomach, take a piss on her . . . while [Candella's] father was watching and kill [Candella's] dog . . . ." The prosecutor asked in a follow-up question whether Candella recently had been to any court hearings at about the time he received the threatening telephone call. The defendant objected on the ground of relevance, and the prosecutor argued that the question was relevant to "what was said on the phone in relationship to when it was said." The court overruled the defendant's objection, and Candella testified that he recently had been to a court proceeding. He also testified that during both court appearances, he had been emotional and that he was "crying" and "upset." Moreover, Candella testified that, at the time he received the threatening telephone call, the defendant had an upcoming sentencing hearing relating to the defendant's involvement in the Lafayette Park incident.

Candella's mother also testified that she had spoken at the sentencing hearings of O'Hagen and the youthful offender and that the last proceeding had occurred in July, 2007. As the state was about to ask its next question, the defendant asserted the "same relevance objection that [he] had before" and argued that a "crucial link" was missing. The prosecutor argued that it "goes once again to motive and intent, an element of the crime

. . . ." The court overruled the defendant's objection, and Candella's mother testified that the defendant's sentencing in the Lafayette Park incident was scheduled to occur about one week after her son had received the threatening telephone call.

We conclude that the court did not abuse its discretion in admitting the evidence relating to Candella's involvement in the sentencing proceedings of O'Hagen and the youthful offender. The requisite connection between Candella's involvement in the two prior sentencing proceedings and the present crimes was established through his testimony that the defendant accused him of being "a little bitch in court" and crying at "someone's court trial," before he threatened to cut the stomach of Candella's mother and to kill his dog. This testimony supports the inferences that the defendant was aware of Candella's involvement in the prior sentencing proceedings of O'Hagan and the youthful offender and that the threats made by the defendant over the telephone were related to such involvement. Moreover, this testimony supports the further inference that the defendant was motivated to make the call to persuade Candella not to appear and to speak at the defendant's sentencing hearing, which was scheduled to occur two weeks after Candella received the threatening telephone call.

### III

In his final claim, the defendant asserts that the prosecutor committed improprieties that deprived him of a fair trial. Specifically, the defendant argues that it was improper for the prosecutor, during closing argument, (1) to reference a "total access phone" because in doing so the prosecutor referred to a fact that was not in evidence and (2) to suggest that the defendant did not need to be physically present to be a party to the threatening telephone call because such a suggestion was

unsupported by the evidence and, therefore, speculative. We agree.

We note that the defendant did not object to the improprieties he now claims on appeal. The defendant's failure to object, however, does not preclude review of his claim. As our Supreme Court has recognized, "a claim of prosecutorial impropriety, even in the absence of an objection, has constitutional implications and requires a due process analysis under *State* v. *Williams*, 204 Conn. 523, 535–40, 529 A.2d 653 (1987)." *State* v. *Gould*, 290 Conn. 70, 77, 961 A.2d 975 (2009). "This does not mean, however, that the absence of an objection at trial does not play a significant role in the application of the *Williams* factors.[2] To the contrary, the determination of whether a new trial or proceeding is warranted depends, in part, on whether defense counsel has made a timely objection to any [incident] of the prosecutor's improper [conduct]." (Internal quotation marks omitted.) *State* v. *Warholic*, 278 Conn. 354, 361, 897 A.2d 569 (2006).

"In analyzing claims of prosecutorial impropriety, we engage in a two step process. . . . First, we must determine whether any impropriety in fact occurred; second, we must examine whether that impropriety, or the cumulative effect of multiple improprieties, deprived the defendant of his due process right to a fair trial. . . . To determine whether the defendant was deprived of his due process right to a fair trial, we must determine whether the sum total of [the prosecutor's] improprieties rendered the defendant's [trial] fundamentally unfair, in violation of his right to due process. . . . The question of whether the defendant has been prejudiced by prosecutorial [impropriety], therefore, depends on whether there is a reasonable likelihood that the jury's verdict would have been different absent the sum total

[2] See part III B.

of the improprieties." (Internal quotation marks omitted.) *State* v. *Gould,* supra, 290 Conn. 77–78.

The defense theories at trial were, namely, a denial of participation in the call and an alibi. To support these theories, the defendant called several witnesses, including his father, Paul Therrien; several family friends; and Connors. Paul Therrien testified that on July 27, 2007, he arrived home from work at 4:30 p.m. and that the defendant arrived home at about 5:30 p.m. Paul Therrien testified that the defendant did not leave the family residence that night and that if the defendant had left he would have informed Paul Therrien, as the defendant typically let Paul Therrien know when "he [was] coming and going." Paul Therrien also testified that family friends Linda Hebert, Russell Hebert and Tina Nadeau came to the house that evening.

Linda Hebert testified that on the evening of July 27, 2007, she and her husband, Russell Hebert, went to the defendant's house to visit Paul Therrien and his wife. She further testified that when she and her husband arrived at the defendant's house at about 6:30 p.m., she went to the back of the house to use the bathroom, and, on her way, she saw the defendant sitting in the living room at a desk with a computer. She testified that she stayed at the defendant's house until 11:30 p.m. and did not see the defendant leave the house while she was there.

Russell Hebert testified that he arrived at the defendant's home on the night of the incident sometime after 6 p.m. and that he saw the defendant there. He testified that he first saw the defendant outside near the front door and then saw him inside the house in the living room. He further testified that he left the defendant's house sometime after 11 p.m. and that he never saw the defendant leave or return to the house while he was there.

Nadeau testified that, on July 27, 2007, she stopped by the defendant's house sometime between 7:30 p.m. and 8 p.m. to drop off some clothes for the defendant's sisters. She testified that when she arrived, she went into the house and saw the defendant sitting in a chair in the living room.

Corinne Langley testified that on the evening of July 27, 2007, she called the defendant's residence several times. One of the calls Langley made occurred at about 9 p.m. and was made to the cellular telephone of the defendant's mother. Langley testified that the defendant answered his mother's cellular telephone and that they had a brief conversation.

Connors testified that on the night of the incident, he and Polowitzer were at the apartment that they shared, that Polowitzer used his cellular telephone to call Candella and that Connors did not immediately participate in the telephone call, but after hearing[3] Candella say some things regarding the defendant, who is Connors' friend, Connors took the telephone from Polowtizer to speak to Candella. Connors further testified that after speaking to Candella, Connors ended the telephone call and that the defendant was not at Connors' apartment the night of the incident and did not participate in the telephone call.

The defendant also introduced into evidence his home telephone records to support his alibi. The defendant's home telephone records, which were marked as a full exhibit, did not show any calls to or from the cellular telephones of Connors or Polowitzer at approximately 7:45 p.m. Connors testified that he and Polowitzer each have a cellular telephone but that they do not

[3] Connors testified that initially Polowitzer was in his room alone talking with Candella but that Polowitzer came out of his room, while still on the telephone with Candella, with the speaker phone function of his cellular telephone activated so that Connors could hear what Candella was saying.

have a home telephone. Moreover, no evidence was presented that the defendant had access to any other telephones, other than his home telephone or his mother's cellular telephone.

In addition, the defendant introduced, as full exhibits, a statement and affidavit and amendment made by Connors as well as a statement and affidavit and amendment made by Polowitzer. Connors and Polowitzer indicated in these documents that Polowitzer called Candella on July 27, 2007, the telephone call was made from the apartment that Connors and Polowitzer shared, that both Connors and Polowitzer participated in the telephone call, that the telephone call pertained to the $200 rent allegedly owed by Candella and that the defendant "was not present during [the telephone call]."

During closing argument, the prosecutor argued with respect to the defendant's alibi evidence the following: "Now, we never allege where [the defendant] was when the phone call was made. Our allegation is that there was a call received by [Candella] . . . . I never alleged where [the defendant] was, whether [the defendant, Polowitzer and Connors] were all together when the call was made, simply that a call was made and the party who got on the phone." After pointing out the inconsistencies in the testimony of the alibi witnesses, the prosecutor then stated: "Once again, I'd argue [that] the claim isn't where [the defendant] was, the claim is [that] a phone call was made . . . ." The prosecutor later stated: "The defense focus that I remember is on alibi, but once again we never alleged nor are we required to prove where [the defendant] was when the phone call was made or [where anybody was] when the phone call was made. What we're looking to prove is that a phone call was made, who it was received by and who made it." In referring to the testimony of the witnesses and how such testimony fits together to show

that the defendant participated in the threatening telephone call, the prosecutor noted that the defendant asserted an alibi defense but that "we never challenged where [the defendant was]." Finally, near the end of his argument, the prosecutor reiterated: "Once again, we don't allege where the call was made. We don't allege how the call was made. We allege that there was a call."

The prosecutor began his rebuttal closing argument by stating: "I never said and we never alleged that [the defendant was] with [Connors] and [Polowitzer] when the phone call was made . . . . [I] [n]ever said they were in the same building, it could have been a total access phone, [I] just said they were on the same line." He then went on to state: "Again, I would argue again the point of an alibi, when we're not alleging [that the defendant] was home or not home, just that [the defendant] was on the other end of that phone. With today's modern technology we all know that it's very easy to be on phones and not be standing right next to somebody." Finally, near the end of his rebuttal, the prosecutor reiterated: "I didn't say where [the defendant] was. I didn't allege where [the defendant] was. I allege [the defendant] [was] on the phone. I allege a call was made. I allege a threat was made."

## A

First, we determine whether prosecutorial improprieties occurred. "[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . .

Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from . . . the special role played by the state's attorney in a criminal trial. He is not only an officer of the court . . . but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is] at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 367–68, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

It is well established that "a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there

is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citation omitted; internal quotation marks omitted.) *State* v. *Ceballos*, 266 Conn. 364, 400, 832 A.2d 14 (2003).

The state concedes, and we agree, that it was improper for the prosecutor to mention the "total access phone" during closing arguments because "no evidence was adduced relating to this particular device, and its specific nature is not commonly known." The state, however, contends that the reference to the defendant not having to be physically present to be a party to the telephone call was not improper. We conclude that it was improper for the prosecutor to have suggested that the defendant did not have to be physically present to be a party to the call.

Until the state's final argument, a significant portion of which was aimed at discrediting the defendant's alibi evidence, it was apparent that the state's theory of prosecution was that all three persons—Polowitzer, Connors and the defendant—participated in the telephone call together at Connors' apartment and that the defendant was the third person to whom the telephone was "passed" for him to make his offending remarks to Candella. We reject the state's attempt on appeal to bifurcate its argument in the trial court into two parts: the concededly improper reference to a "total access phone" and a proper reference to some other method by which the defendant could have participated in the call without being present at the apartment.[4] Indeed, the state apparently had some difficulty in this court in describing such a method, resorting to the scenario that the defendant, at some other location, called in on another telephone and that Connors or Polowitzer then

---

[4] The state does not claim that the telephone call was a prearranged conference call, and there was no evidence to support such a contention.

placed two telephones together so that the defendant's voice was somehow transmitted from his telephone, located elsewhere, to the telephone from which the call was made and thereby to Candella's ear.

We can only describe such a scenario as equally devoid of evidence in the record as a reference to a total access telephone. Indeed, we conclude that the most likely understanding by the jury of the state's argument was that both the reference to the total access telephone and the other scenario were fair game for an inference by the jurors that they should discredit the defendant's alibi because there was evidence the defendant could have participated in the telephone call from somewhere else. This was not, however, fair game for an inference; it was speculation, to say the least.

### B

Having determined that prosecutorial improprieties occurred, we now must determine whether such improprieties deprived the defendant of his due process right to a fair trial. In determining whether the defendant was deprived of a fair trial, we apply the factors enumerated by our Supreme Court in *State* v. *Williams*, supra, 204 Conn. 540, which include "the extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case." (Citations omitted.) Id.

We first determine whether the improprieties were invited by defense counsel. After a review of the record, we conclude that defense counsel did not invite the improprieties.

We next consider whether the improprieties were frequent or severe. Although the prosecutor referenced

the "total access phone" only once in his rebuttal argument, the prosecutor did stress, on eight occasions during his closing argument and rebuttal, that he was not claiming that the defendant was with Connors or Polowitzer, only that a call was made. Taking them together, as we must, we determine that the improprieties occurred frequently.

In determining whether the prosecutorial impropriety was severe, our Supreme Court "consider[s] it highly significant that defense counsel failed to object to . . . the improper [remark], [to] request curative instructions, or [to] move for a mistrial. . . . A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007). In the present case, defense counsel did not object to the improper comments at trial, request a curative instruction or move for a mistrial in relation to the improprieties he now claims on appeal.

"Beyond defense counsel's failure to object, in determining the severity of prosecutorial impropriety, we look to whether the impropriety was blatantly egregious or inexcusable." Id. In *Fauci*, our Supreme Court determined that the improper comment, regarding facts that were not in evidence, made by the prosecutor during closing arguments was not severe because defense counsel did not object and because the comment was mitigated by other comments made by the prosecutor that "tended to vouch for the alibi of the defendant." Id., 52.

Although defense counsel did not object to the comments made by the prosecutor in the present case, the prosecutor did not mitigate the harmfulness of his comments by lending support to the defendant's defense as

in *Fauci*; rather, the prosecutor's comments were aimed at rendering the defendant's alibi evidence irrelevant. During trial, the prosecutor did not present any evidence that the defendant could have participated in the telephone call without physically being present. The defendant presented strong alibi evidence: five individuals testified that he was home at the time the telephone call was made. Additionally, the defendant's home telephone records did not show that the defendant made or received any calls from Connors or Polowitzer at about the time of the telephone call. Moreover, Connors testified that the defendant did not participate in the telephone call, and the defendant's involvement in the telephone call was denied by both Connors and Polowitzer in the amendments to their affidavits to police. Therefore, the only way that the defendant could have participated in the call, on the basis of the evidence presented, was if the defendant was with Connors and Polowitzer when they made the call. The prosecutor, however, during closing and rebuttal arguments, gave the jury the means to find the defendant guilty without being in the presence of Connors or Polowitzer. This line of argument was contrary to the evidence presented at trial and misled the jury. We therefore conclude that although the defendant did not object, in the context of this case, the comments made by the prosecutor were severe.

Turning to the next factor, we determine that the improprieties made by the prosecutor were critical to the central issue in the case, that is, whether the defendant participated in the threatening telephone call. Candella testified that he received a call in which he and his family were threatened on July 27, 2007. He testified that there were three callers involved in the telephone call and that the third caller identified himself as "Chris, who kicked [your] ass at the park." Candella, however, also testified that the telephone was "passed" to the

third caller, thereby strongly suggesting that the third caller physically was at the same location as the first two callers. The defendant did not dispute that approximately one year before the telephone call was made, he had been involved in a confrontation with Candella in Lafayette Park, in which the defendant physically hurt Candella. Connors, however, testified that the telephone call was made from the apartment that he shared with Polowitzer and that the defendant was not present in the apartment, nor had he participated in any way. In addition, the amendments to the affidavits of both Connors and Polowitzer specifically stated that the defendant "was not present during [the telephone call]." Furthermore, the defendant had strong alibi evidence, backed up by telephone records, placing him at his home at the time of the telephone call. Thus, whether the defendant physically was located in the same place as Connors and Polowitzer was critical to determining whether the defendant participated in the call.

Finally, the state's case was not strong: there was no physical evidence tying the defendant to the telephone call, and the only evidence connecting him to the crime was the testimony of Candella and Maloney, the supervisory judicial marshal, which was undermined on cross-examination and through the testimony of other witnesses. See *State* v. *Montoya*, 110 Conn. App. 97, 109, 954 A.2d 193 ("cases that lack conclusive physical evidence and are merely credibility contests are not particularly strong cases"), cert. denied, 289 Conn. 941, 959 A.2d 1008 (2008).

Candella's testimony was impeached on several occasions. For example, he denied that he compared the telephone call he received to the terrorist attacks of September 11, 2001, and to the Iraq war. Poliquin, however, confirmed that Candella did in fact make that comparison when Poliquin spoke to Candella on the night of the call. Candella also testified that he never

used illegal drugs and that he did not tell Poliquin that he previously had smoked marijuana, whereas Poliquin testified that Candella admitted that he smoked "weed." With regard to the alleged $200 debt Candella owed to Polowitzer, Candella testified that there was no discussion of the alleged debt during the telephone call and that he never told Poliquin that the subject came up during the telephone call. Poliquin testified, however, that, when he confronted Candella about the $200 debt at the police station on the evening of the incident, Candella admitted that it came up during the telephone call.

Candella's testimony also was inconsistent with the recollection of his mother concerning the events following the telephone call. Candella testified that he called his parents' house telephone and cellular telephones after he received the call to make sure they were safe. He testified that he called his parents "at least twenty times" before he finally reached them approximately one hour after he first called them. Candella's mother, to the contrary, testified that she answered his call at 7:45 p.m., which was immediately after he received the threatening telephone call.

Candella's testimony was also inconsistent with the testimony of probation officer Cynthia Cole. The defendant attempted to demonstrate Candella's bias toward the defendant with evidence that Candella had told Cole that he wanted the defendant to receive the maximum sentence in the Lafayette Park case. Candella denied that he was contacted by Cole and that he had told her that he wanted the defendant to get the maximum sentence. Cole contradicted him, stating that she did speak with him and that he told her that the defendant should receive the maximum sentence for his role in the Lafayette Park incident. Candella's mother even contradicted her son's testimony when she testified that he had told her that he wanted the individuals involved

in the Lafayette Park incident to receive the maximum sentence.

Maloney's credibility also was called into question. During his testimony, Maloney claimed to have remembered the defendant's exact words eleven days after he heard them even though he stated that he "put it out of his head" as soon as the statement was made and did not think about the defendant in the intervening period. Maloney also admitted that he was mistaken about the defendant's exact words despite his initial certainty.

In light of the foregoing, we conclude that the defendant has demonstrated that he was deprived of his due process right to a fair trial. The state's case was not very strong. The prosecutorial improprieties were not invited by the defense counsel and, although not objected to, occurred with significant frequency and were severe. Finally, they went to the heart of the case, namely, whether the defendant participated in the telephone call, and they gave the jury a reason to disregard the defendant's strong alibi evidence.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.