STATE OF CONNECTICUT *v.* MARQUIS JONES
(AC 33522)

Bear, Espinosa and Lavery, Js.

---

Argued January 4—officially released May 29, 2012

*Glenn W. Falk*, special public defender, for the appellant (defendant).

*Susann E. Gill*, supervisory assistant state's attorney, with whom, on the brief, were *John C. Smriga*, state's attorney, and *Howard S. Stein*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. The defendant, Marquis Jones, appeals from the judgment of conviction, following a jury trial, of felony murder in connection with the death of the victim, Horace Cheatham.[1] The defendant claims that (1) prosecutorial impropriety during closing argument deprived him of his due process right to a fair trial and (2) this court should exercise its supervisory authority and grant him a new trial as a result of the prosecutor's improper closing argument. We affirm the judgment of the trial court.

On the basis of the evidence presented at trial, the jury reasonably could have found the following facts.

---

[1] The jury found the defendant not guilty of murder. The court sentenced the defendant to serve a term of imprisonment of forty years, to run consecutively to another sentence imposed in a different criminal proceeding.

On the evening of December 26, 2002, the eighteen year old victim, accompanied by his cousin, Sam Moore, attended a party at a club in Bridgeport. The defendant was at the club at the same time as the victim and Moore. After leaving the club, the victim and Moore went to a nearby restaurant. The defendant, who was armed with a gun, arrived at the same restaurant at approximately 1 a.m. While there, the defendant learned that the victim and Moore were interested in purchasing marijuana. The defendant told an acquaintance, Gary Browning, that the victim and Moore had money and that he wanted to rob them. Browning arranged to sell marijuana to the victim and led him to a nearby backyard to complete the sale. Thereafter, the defendant approached the victim from behind and stated: "You know what time it is, run that shit."[2] As Browning walked away from the victim, the defendant shot the victim in the back of the head and took money and drugs from him. The gunshot caused the victim's death. The victim's body was found on the snow coated ground the next morning.

A jury found the defendant guilty of felony murder in connection with the victim's death. The defendant filed various postverdict motions. One of these motions was a motion for a new trial on the ground of prosecutorial impropriety, which the court denied. This appeal followed the defendant's sentencing.

I

First, we address the defendant's claim that he is entitled to a new trial because prosecutorial impropriety during closing argument deprived him of his due process right to a fair trial. The defendant's claim focuses on several arguments made by the prosecutor, which we will address in turn. Prior to reaching the

---

[2] Browning testified that this statement meant that a robbery was taking place.

merits of the claim, however, we set forth the principles that guide our analysis.

"In analyzing claims of prosecutorial impropriety, we engage in a two step analytical process. . . . The two steps are separate and distinct. . . . We first examine whether prosecutorial impropriety occurred. . . . Second, if an impropriety exists, we then examine whether it deprived the defendant of his due process right to a fair trial. . . . In other words, an impropriety is an impropriety, regardless of its ultimate effect on the fairness of the trial. Whether that impropriety was harmful and caused or contributed to a due process violation involves a separate and distinct inquiry. . . .

"[O]ur determination of whether any [impropriety] by the state's attorney violated the defendant's fair trial rights is predicated on the factors set forth in *State* v. *Williams*, [204 Conn. 523, 540, 529 A.2d 653 (1987)], with due consideration of whether that [impropriety] was objected to at trial. . . . These factors include: [T]he extent to which the [impropriety] was invited by defense conduct or argument . . . the severity of the [impropriety] . . . the frequency of the [impropriety] . . . the centrality of the [impropriety] to the critical issues in the case . . . the strength of the curative measures adopted . . . and the strength of the state's case. . . .

"[W]hen a defendant raises on appeal a claim that improper remarks by the prosecutor deprived the defendant of his constitutional right to a fair trial, the burden is on the defendant to show, not only that the remarks were improper, but also that, considered in light of the whole trial, the improprieties were so egregious that they amounted to a denial of due process." (Citations omitted; internal quotation marks omitted.) *State* v. *Payne*, 303 Conn. 538, 560–63, 34 A.3d 370 (2012).

A

The defendant's primary claim concerns an argument made by the prosecutor during rebuttal closing argument. The argument was related to photographic exhibits that depicted the crime scene shortly after the victim's body was discovered on December 27, 2002. The photographs depict, among other things, the victim's body as well as footprints in the snow surrounding the body. The photographs reflected that the victim's clothing was disheveled.

Our analysis of the prosecutor's argument requires that we review the evidence related to footprints at the crime scene. Browning testified on the state's behalf at trial, relating the following version of events.[3] Browning illegally sold drugs at the time of the events at issue. After meeting the victim at the restaurant, he agreed to sell him one-half ounce of marijuana. Browning knew the defendant, who remarked to him that the victim and Moore "had money" and that he wanted to rob them. The defendant was armed with a revolver at the restaurant. Browning led the victim from the restaurant to a nearby backyard, at which time he left the victim alone so that he could retrieve the marijuana from a trash can on his back porch. When he returned, he completed the sale of the marijuana.

Then, Browning observed the defendant approaching the victim on foot from an area between two houses,

---

[3] Browning testified that he was arrested in connection with the victim's death and, like the defendant, was charged with murder and felony murder. At the time of his own trial, Browning reached an agreement with the state; he agreed to testify for the state in the defendant's case in exchange for a reduction in the severity of the charges against him. In exchange for his cooperation and testimony against the defendant, he was permitted to plead guilty to conspiracy to commit robbery in the first degree and would receive a sentence of two years incarceration, to be served concurrently with a sentence already imposed in another proceeding, as well as five years of special parole. Browning stated that, although he "set up" the victim for a robbery, he did not want to go to jail for killing the victim.

from the direction of Central Avenue. Browning believed that the defendant was going to rob the victim "[b]ecause that was the plan." Browning turned and walked away from the victim, at which time he heard the defendant say, "[y]ou know what time it is, run that shit." Shortly thereafter, Browning heard a single gunshot. When he turned around, he saw the victim lying on the ground. The defendant was alone when he approached the victim and was the only person in the vicinity of the victim's body when Browning turned back and observed the victim lying on the ground. Browning testified that he was wearing Converse sneakers at the time of the victim's shooting and that he believed that the defendant was wearing Nike Air Force One sneakers.

During his trial testimony, Browning was shown photographic exhibits that depicted the crime scene, and he described the area where he left the victim, as well as where he walked to his backyard in order to obtain the marijuana that he sold to the victim. To this end, he identified a trail in the snow as a path that he frequently traveled between houses in order to obtain drugs for buyers. The state introduced the photographic exhibits depicting the crime scene during the testimony of Bryant Davis, a bystander who resided near the crime scene and observed the victim's body in a neighboring yard at approximately 7:20 a.m. on December 27, 2002.

Kimberly Biehn, a Bridgeport police detective, testified that she processed the crime scene as a member of the major crimes unit. She testified that when she arrived on the scene there was snow on the ground. She was unable to recall when the snowfall began or how long the snow had existed at the scene. She testified that the police cordoned off the crime scene and walked through the scene to identify potential evidence. She observed more than one type of footprint in the snow at the crime scene. She recalled that one type

of footprint that appeared around the victim's body numerous times was unique in that it featured a star shaped pattern, consistent with Converse brand sneakers. Also, Biehn testified that she observed footprints in the area of the victim's body that appeared to have been made with boots.

A police investigation report prepared by Detective Joette Devan of the Bridgeport police department was admitted into evidence. In relevant part, the report stated: "In my initial survey of the scene, I noticed 2 shoeprints in the driveway between 58 and 72 Bunnell Street. The shoeprints were going down the driveway toward Bunnell Street. The same shoeprints were abundant in the immediate vicinity of the victim's body. Closer inspection of one of the shoeprints to the right of the victim's body (when facing Central Ave.) revealed a small star in the center of the print which is the symbol commonly used by Converse. There were also several of these same shoeprints toward Central Ave. (rear yard of 863 Central Ave.) Det. Kalagian stated that he followed the shoeprints to the rear yard of 386 Central Ave. and down that driveway toward Central Ave."

Bridgeport police Detective Robert Winkler testified that the police determined, as a result of their investigation, that Browning was wearing Converse All Star sneakers on the night of the shooting. Additionally, he stated that the defendant told the police that he was wearing Nike Air Force One sneakers on the night of the shooting.

During the state's initial closing argument, the prosecutor referred to footprint evidence only once, in the context of suggesting to the jury that the defendant's attorney likely would argue that it was Browning, not the defendant, who killed the victim. In this vein, the prosecutor observed that Browning's footprints were

found "all over the crime scene." During closing argument, the defendant's attorney argued that the evidence supported a finding that Browning killed the victim. The defendant's attorney argued that Browning's testimony was not credible. He argued in relevant part: "The problem with that is, where's [the defendant's] footprints, the Nike Air Force Ones? Whose footprints are around the body? Whose footprints lead out to Bunnell Street?" After reading from Devan's police report, the defendant's attorney reminded the jury that the footprints that led out to Bunnell Street from the crime scene likewise led to Browning's residence.

The defendant's attorney then stated: "If someone's committing a robbery and they're messing with the body pulling his pants off, [the defendant's] supposedly doing that, where's his print? Where's another print other than boots like Detective Biehn said, and the Converse?

"These Converse prints—they weren't disturbed, they weren't disturbed. There was no other shoe prints between them, on them, around them, that's the first print that the cops noticed, those prints. I know the pictures [of the Converse shoe prints] are a little cockeyed, but take a look at them when you see them. . . . If . . . Browning leaves the scene and goes away, and then [the defendant] shows up, how come his prints aren't there? How come they're not . . . around the body? . . . Where's [the defendant's] prints? He's walking through the snow, where are they? Did he float in? How did he get to the crime scene? Because remember, if you don't believe . . . Browning, okay, this case is over with." Later during his argument, the defendant's attorney reiterated that Browning's footprints, and not the defendant's footprints, surrounded the victim's body.

During the state's rebuttal argument, the prosecutor argued in relevant part as follows: "Footprints, things

around the body? I mean, let's face it, I mean we almost had a marching band going through this area. What is necessarily there? [What is] there [are] the footprints around the perimeter [of the crime scene], not up close. It's around the perimeter. The ones that [the defendant's attorney] showed you, which he wanted you to believe [were] around the body, but it was much further away. Down the driveway, around the periphery. Then to that extent, that's what is there."

Thereafter, the prosecutor discussed Browning's version of events, including the manner in which Browning completed his sale of marijuana to the victim and walked away. Additionally, the prosecutor discussed Browning's testimony that the defendant approached the victim from the area of Central Avenue. Calling the jury's attention to state's exhibit six, a photograph of the crime scene, the prosecutor argued that it depicted Browning's footprints to and from his residence. The prosecutor implicitly argued that the exhibit also depicted the defendant's footprints: "But look over here along the tree line on that direct shot. There are footprints over here that seem to be coming through the snow leading directly up to where the body is, right over here. Not the pathway here to Browning's yard, but in over here, coming along that tree line. There is what appears to be footprints in the snow that lead directly up to the victim from behind.

"Where—if those are Browning's footprints, if you find that to be credible, coming up behind. Browning—coming up behind the victim. And you can see those in state's [exhibit] six.

"You can also see them in state's [exhibit] eight where from where the victim is laying, if you look directly behind where the victim's body is, you will see a set of prints that are coming up directly behind the victim in back there, walking right up. Not these prints out

here by the dumpster, not these Browning's, but they're coming from this direction."

The defendant's attorney did not object to this argument during closing argument or immediately thereafter. Following the jury's verdict, in a motion for a new trial, the defendant claimed that the prosecutor's argument, insofar as it suggested that the defendant's footprints were visible in the photographic exhibits of the crime scene, was improper because it was not supported by the evidence and was purely speculative.

The court denied the defendant's motion for a new trial. The court concluded that the prosecutor's argument concerning footprints was improper: "The problem with this argument is that there was no evidence offered during the trial concerning the footprints pointed out on the photographs by the prosecutor. Moreover, it is apparent from the crime scene tape and police vehicles shown in the photographs that they were taken after police personnel had been on the scene. The footprints could have been those of police personnel, emergency medical personnel, unknown third parties or (as argued by the prosecutor) the defendant.

"The state asserts that because these photographs [of the crime scene] were admitted as full exhibits without limitation, the argument was proper. This position goes too far. The photographs were offered only as general views of the crime scene as observed by the crime unit Detective Biehn. No testimony or other evidence identified the footprints highlighted in the prosecutor's argument as being relevant to the investigation. To the contrary, the only footprints mentioned in the evidence were the Timberland boot prints and Converse All Star sneaker prints. . . . Evidence admitted for one purpose at trial . . . cannot be used after the close of evidence for a different purpose. To do so would

deprive an opponent from submitting rebuttal evidence, meaningful cross-examination or impeachment. . . .

"In the present case, because the claim that the footprints in exhibits six and eight were those of the defendant first came into the case during the state's rebuttal argument, the defense was deprived of any meaningful opportunity to meet this assertion. On the record of the trial as it existed, the prosecutor's argument asked the jury to speculate, or worse, amounted to a form of unsworn testimony. The argument was improper." (Citation omitted; internal quotation marks omitted.)

Thereafter, the court concluded that the impropriety did not deprive the defendant of a fair trial. The court focused on the fact that the defendant did not object to the argument and, thus, deprived the court of an opportunity to deliver a curative instruction to the jury. The court also determined that it was "highly likely that the jury did not fully accept Browning's version of the crime as shown by [its] verdict of not guilty on [the] murder [count of the information]." The court reasoned that the footprint argument was merely an attempt to corroborate Browning's version of how the shooting occurred. Finally, the court determined that the impropriety was "not so blatantly egregious or inexcusable as to require the invalidation of the jury's verdict and an order for a new trial."

On appeal, the defendant, citing the court's memorandum of decision, argues that the prosecutor's argument was improper in that it was not based on evidence and was made for the first time during the state's rebuttal argument, when the defense lacked an opportunity to rebut it. Relying on the court's determination that the argument was improper, the defendant devotes the majority of his argument to a due process analysis. He argues that a proper consideration of the factors set forth in *State* v. *Williams*, supra, 204 Conn. 535–40,

should have led the court to conclude that he was deprived of a fair trial and, thus, was entitled to a new trial. The state urges us to conclude that the prosecutor's argument was not improper and that, even if it was, it did not deprive the defendant of a fair trial.

"[P]rosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . In determining whether such [impropriety] has occurred, the reviewing court must give due deference to the fact that [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case. . . . This heightened duty derives from our long recognition of the special role played by the state's attorney in a criminal trial. He is not only an officer of the court, like every attorney, but is also a high public officer, representing the people of the [s]tate, who seek impartial justice for the guilty as much as for the innocent. In discharging his most important duties, he deserves and receives in peculiar degree the support of the court and the respect of the citizens of the county. By reason of his office, he usually exercises great influence upon jurors. His conduct and language in the trial of cases in which human life or liberty [is]

at stake should be forceful, but fair, because he represents the public interest, which demands no victim and asks no conviction through the aid of passion, prejudice, or resentment. If the accused be guilty, he should [nonetheless] be convicted only after a fair trial, conducted strictly according to the sound and well-established rules which the laws prescribe. While the privilege of counsel in addressing the jury should not be too closely narrowed or unduly hampered, it must never be used as a license to state, or to comment upon, or to suggest an inference from, facts not in evidence, or to present matters which the jury ha[s] no right to consider. . . .

"Or to put it another way while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one. . . . A prosecutor must draw a careful line. On the one hand, he should be fair; he should not seek to arouse passion or engender prejudice. On the other hand, earnestness or even a stirring eloquence cannot convict him of hitting foul blows. . . .

"It is well established, furthermore, that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . .

"A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence. . . . Moreover, when a prosecutor suggests a fact not in evidence, there is a risk that the jury may conclude that he or she has independent knowledge of facts that could not be presented to the jury." (Citations omitted; internal quotation marks omitted.) *State* v. *Skakel*, 276

Conn. 633, 744–46, 888 A.2d 985, cert. denied, 549 U.S. 1030, 127 S. Ct. 578, 166 L. Ed. 2d 428 (2006).

In the present case, the court's conclusion that prosecutorial impropriety occurred was a conclusion of law based on its review of the evidence and the closing arguments and was not based on any findings of fact. Accordingly, we afford the issue plenary review. As a preliminary matter, we observe that the photographic exhibits of the crime scene, state's exhibits six and eight, were admitted during the state's direct examination of Davis. Davis testified that on the morning of December 27, 2002, he discovered the victim's body in a yard near his residence and called 911. Davis referred to the exhibits during his testimony as representing his residence and the victim's body, as they appeared on the morning of December 27, 2002. Absent objection, these photographs of the crime scene were admitted as full exhibits, and the court did not deliver a limiting instruction as to their use by the jury. Later, Detective Biehn referred to photographic exhibits of the crime scene, including state's exhibit eight, as depicting the victim's appearance when the police arrived on the scene.

We disagree with the argument advanced by the defendant and accepted by the court that the state's argument invited the jury to consider the evidence for a purpose other than that for which it was admitted. The photographic exhibits at issue were admitted as full exhibits, not for a particular purpose. This is not a case in which the prosecutor invited the jury to disregard a limiting instruction. As our Supreme Court has observed, the rule annunciated in our case law is that "[a]n exhibit offered and received as a full exhibit is in the case for all purposes." (Internal quotation marks omitted.) *State* v. *Camacho*, 282 Conn. 328, 377, 924 A.2d 99, cert. denied, 552 U.S. 956, 128 S. Ct. 388, 169 L. Ed. 2d 273 (2007).

We disagree that the state's argument was not based on the evidence or reasonable inferences drawn therefrom. The photographic exhibits at issue were admitted as accurate representations of the crime scene after the police arrived at the scene. The defendant does not argue that the photographs failed to reflect footprints in the area of the victim's body or that the photographs did not depict the specific footprints referred to in the prosecutor's argument. Rather, the defendant appears to argue, as the court found, that the argument was improper because no witness testified about the existence or source of these footprints.

Although there was no testimony, expert or otherwise, concerning the specific footprints at issue, that fact does not lead us to conclude that it was improper for the prosecutor to suggest that the footprints were those of the defendant. There was ample testimony from Browning concerning the defendant's conduct at the crime scene at the time of the shooting. Specifically, Browning testified as to the route taken by the defendant as he approached the victim prior to the shooting; he testified that the defendant approached the victim from an area between two houses, from the direction of Central Avenue. This area was depicted in the photographic exhibits. On the basis of this testimony, as well as the footprints depicted in the photographs, we conclude that there was an ample basis in the evidence to suggest that the footprints were those of the defendant.

Certainly, as the court observed, the jury reasonably could have concluded that the footprints in the photographs, which were taken after emergency personnel had arrived on the scene, were not those of the defendant. That the evidence was susceptible to different interpretations, however, does not render the argument improper. The prosecutor's argument was made in response to the argument of the defendant's attorney that Browning's version of events was not credible,

perhaps even impossible, because there was no evidence of the defendant's footprints in the snow. The prosecutor's argument did not suggest that the footprints were proven to be those of the defendant, but it invited the jury to consider the fact that there were footprints in the snow that were consistent with Browning's testimony.

The argument invited the jury to draw a reasonable inference from the evidence. The inference was reasonable because the photographs undeniably depicted the crime scene, the photographs depicted footprints around the victim's body and the state elicited testimony from Browning that was entirely consistent with footprints that appeared in the photographs of the crime scene. The prosecutor was not precluded from interpreting the evidence elicited consistent with a finding of guilt. See *State* v. *David O.*, 104 Conn. App. 722, 734 n.5, 937 A.2d 56 (2007), cert. denied, 285 Conn. 915, 943 A.2d 473 (2008). Moreover, in making the challenged argument, the prosecutor referred to Browning's testimony concerning the events at issue as well as to specific exhibits, namely, state's exhibits six and eight. For this reason, we conclude that the argument was not a form of unsworn testimony, for it did not appear to be based on the prosecutor's personal knowledge or facts that were not in evidence, but on the evidence itself.

Finally, we disagree with the court's rationale that the prosecutor's argument was improper because it was made for the first time during rebuttal argument. As the court observed, during his initial argument, the prosecutor did not suggest to the jury that there was evidence of the defendant's footprints at the crime scene. Discussion of the defendant's footprints, or lack thereof, first arose during the defense's closing argument, when the defendant's attorney undeniably suggested that the defendant's footprints were not in the vicinity of the victim's body. We conclude that it was

not unfair for the prosecutor, during his rebuttal argument, to respond to this argument. In so doing, he did not inject a new theory of liability into the case at a time when the defendant was unable to respond to it. Rather, within the proper scope of rebuttal argument, the prosecutor merely confronted the inference drawn for the first time by the defendant's attorney during his closing argument. In so doing, the prosecutor did nothing more than interpret the evidence in a manner consistent with Browning's testimony and the theory of liability that the state had advanced throughout the trial.[4]

On the basis of the foregoing analysis, we conclude that prosecutorial impropriety did not occur. Accordingly, we need not consider whether the prosecutor's conduct deprived the defendant of a fair trial.

B

In addition to the argument concerning footprints analyzed previously, the defendant draws our attention to ten other arguments of the prosecutor that he labels as instances of prosecutorial impropriety. He invites this court to consider these arguments in resolving his claim that prosecutorial impropriety deprived him of a fair trial. Our review of the defendant's analysis of his claim reveals that the defendant, in summary fashion, merely has listed these portions of closing argument as well as relevant defense objections and rulings related thereto. He has not provided this court with a separate and thorough analysis, supported by reference to the evidence presented at trial and to legal authority, in

---

[4] For this reason, the argument under review is distinguishable from the improper conduct at issue in *State* v. *Therrien*, 117 Conn. App. 256, 273, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009), on which the defendant relies heavily. In *Therrien*, this court held that prosecutorial impropriety occurred during the state's final argument when the prosecutor referred to facts that were unrelated to the evidence and introduced a theory of prosecution that was contrary to that advanced during the trial. Id., 273–74.

an attempt to demonstrate why each argument was improper and why it deprived him of a fair trial. For this reason, we decline to review this aspect of the claim. See, e.g., *State* v. *Monahan*, 125 Conn. App. 113, 122–23, 7 A.3d 404 (2010), cert. denied, 299 Conn. 926, 11 A.3d 152 (2011).

## II

Next, the defendant claims that this court should exercise its supervisory authority and grant him a new trial as a result of the prosecutor's allegedly improper closing argument. "[An appellate court] may invoke [its] inherent supervisory authority in cases in which prosecutorial [impropriety] is not so egregious as to implicate the defendant's . . . right to a fair trial . . . [but] when the prosecutor deliberately engages in conduct that he or she knows, or ought to know, is improper. . . . [S]uch a sanction generally is appropriate . . . only when the [prosecutor's] conduct is so offensive to the sound administration of justice that only a new trial can effectively prevent such assaults on the integrity of the tribunal. . . . Accordingly, in cases in which prosecutorial [impropriety] does not rise to the level of a constitutional violation, we will exercise our supervisory authority to reverse an otherwise lawful conviction only when the drastic remedy of a new trial is clearly necessary to deter the alleged prosecutorial [impropriety] in the future." (Citations omitted; internal quotation marks omitted.) *State* v. *James G.*, 268 Conn. 382, 422–23, 844 A.2d 810 (2004). Because we conclude that the argument concerning footprints addressed in part I A of this opinion was not improper and we do not consider the other claimed instances of improper argument addressed in part I B of this opinion, we decline the invitation to exercise our inherent supervisory authority over the administration of justice.

The judgment is affirmed.

In this opinion the other judges concurred.