# STATE OF CONNECTICUT *v.* DRICE PICKEL
## (AC 30558)

Bishop, Gruendel and Beach, Js.

Argued January 21—officially released June 1, 2010

*Christopher Y. Duby*, special public defender, for the appellant (defendant).

*Brenda Hans*, deputy assistant state's attorney, with whom were *Erika L. Brookman*, assistant state's attorney, and, on the brief, *John C. Smriga*, state's attorney, and *Marc Durso*, assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Drice Pickel, appeals from the judgment of conviction, following a jury trial, of escape in the first degree in violation of General Statutes § 53a-169 (a) (2). The defendant claims that there was insufficient evidence to support his conviction. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant. On November 6, 2002, the defendant pleaded guilty to two counts of failure to appear in the second degree in violation of General Statutes § 53a-173 (a) (1). The court imposed a total effective sentence of one year incarceration. After serving six months and nine days of his sentence, the defendant was released on May 9, 2003, from prison to serve the remainder of his sentence in the community under the transitional supervision program.[1] On that day, the defendant met with his correctional counselor, Pamela Buster, and signed an agreement setting forth the conditions of his transitional supervision. One condition of the defendant's release to transitional supervision was that he was to reside at 70 Highland Avenue in Danbury, which was the residence of Arlene Blunt, the defendant's mother,

---

[1] See General Statutes § 18-100c.

and Leland Blunt, the defendant's stepfather and sponsor for the purposes of transitional supervision.

On May 9, 2003, the defendant moved into the Blunt residence at 70 Highland Avenue in Danbury. The defendant's fiancee, Kimberline Jim, who was then pregnant with the defendant's child, also resided at the residence. The child was born on June 27, 2003, and remained in the hospital for some time thereafter. Friction existed between Jim and Arlene Blunt. Reportedly, Jim would not help out around the house after Arlene Blunt had broken her femur in November, 2002. This friction escalated on July 6, 2003, when Jim told Arlene Blunt that she "doesn't have to help [Arlene Blunt]." Arlene Blunt told Jim to "get out." Leland Blunt also told Jim "to leave right then and there." Afterward, Jim informed the defendant of the situation, and he spoke with the Blunts. The defendant "[stuck] up for [Jim]," and the discussion became heated. Leland Blunt told the defendant that "[i]f he could not abide by [Arlene Blunt's] and my decision, then pack your bags and get out."[2]

That evening, the defendant and Jim left 70 Highland Avenue and repaired to the Bethel Motor Lodge in Newtown. The defendant testified that he did not contact Buster before he left the residence because it was 7:30 p.m., and "[t]here was no way to contact her." The defendant and Jim stayed at the motor lodge for approximately one and one-half weeks before they moved to a condominium in Danbury. After they moved to Danbury, their newborn son finally was released from the hospital. After staying at the condominium for a few days, the defendant, Jim and the child left the state and went to Arizona. Jim testified that she and the defendant went to Arizona because their newborn son was ill, and

---

[2] Whether the defendant was absolutely or conditionally ordered out of the residence by his mother or stepfather was a disputed issue at trial. The jury, of course, was entitled to resolve this factual issue.

she could receive free medical care for their son on the Navajo reservation, where she had lived for most of her life.

When the defendant failed to report to Buster, she attempted unsuccessfully to contact him.[3] The defendant was arrested approximately three years later and was charged in May, 2006, by way of long form information with escape in the first degree. In the information, the state alleged that "on or about July 2003, the said defendant escaped from a . . . community residence, to wit: the Community Residence Program (Transitional Supervision) located at 70 Highland Avenue, located in Danbury, Connecticut, to which he was transferred . . . ." Following a jury trial, the defendant was convicted of escape in the first degree. This appeal followed.

It is uncontradicted that the defendant left 70 Highland Avenue on approximately July 6, 2003, and at trial the parties stipulated that at the time of that incident, the defendant was in the custody of the commissioner of correction (commissioner). The defendant claims that there was insufficient evidence to demonstrate that he intended to escape from the custody of the commissioner.[4] He argues that he was required to reside at 70

---

[3] Jim testified that she contacted Buster once after leaving the Highland Avenue residence. Buster testified, however, that the defendant did not call to tell her that he had moved out of 70 Highland Avenue. Once the defendant failed to report, Buster made efforts to contact him. She telephoned the defendant at the Highland Avenue residence and on his cellular telephone, leaving messages asking the defendant to contact her. She did not receive any return calls from the defendant. Leland Blunt testified that he telephoned Buster and informed her that it was his belief that the defendant had left the state and had gone to Arizona.

[4] To the extent that this claim is unpreserved, the defendant seeks review under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), and the plain error doctrine. See Practice Book § 60-5. It is well established that the defendant's claim is reviewable without resorting to either of these doctrines. "[A]ny defendant found guilty on the basis of insufficient evidence has been deprived of a constitutional right, and would therefore necessarily meet the four prongs of *Golding*. Accordingly, we conclude that no practical reason

Highland Avenue as a condition of his release from prison and that he was also required to comply with his sponsor's wishes. He contends that he left the Highland Avenue residence in order to comply with his sponsor's wishes, and, therefore, he did not leave the residence with the requisite intent. He argues that his act of leaving the residence constituted, at most, a failure to comply with the condition of his transitional supervision that he reside at 70 Highland Avenue and did not constitute the crime of escape.[5] We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a two-part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [finder of fact] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Na'im B.,* 288 Conn. 290, 295–96, 952 A.2d 755 (2008).

"It is well established that the question of intent is purely a question of fact. . . . Intent may be, and usually is, inferred from the defendant's verbal or physical

exists to engage in a *Golding* analysis of a sufficiency of the evidence claim and, thus, review the challenge as we do any other properly preserved claim." (Internal quotation marks omitted.) *State* v. *Torres,* 111 Conn. App. 575, 579, 960 A.2d 573 (2008), cert. denied, 290 Conn. 907, 964 A.2d 543 (2009).

[5] The defendant also claims that his leaving Connecticut to go to Arizona could not constitute an escape because the state did not prove that he left for Arizona while on transitional supervision. We need not address this argument because the designated community residence was the only place from which the defendant technically could escape, and there was sufficient evidence that he intended to escape from that residence.

conduct. . . . Intent may also be inferred from the surrounding circumstances. . . . The use of inferences based on circumstantial evidence is necessary because direct evidence of the accused's state of mind is rarely available. . . . Intent may be gleaned from circumstantial evidence such as . . . the events leading up to and immediately following the incident." (Internal quotation marks omitted.) *State* v. *Saez,* 115 Conn. App. 295, 302–303, 972 A.2d 277, cert. denied, 293 Conn. 909, 978 A.2d 1113 (2009).

Section 53a-169 (a) provides in relevant part: "A person is guilty of escape in the first degree . . . (2) if he escapes from any . . . community residence to which he was transferred pursuant to subsection (e) of section 18-100 . . . ." "The unifying overall theme of § 53a-169 is that an individual will risk punishment for escape for an unauthorized departure from, or failure to return to, whatever may be designated as his place of incarceration or confinement. That theme illuminates the meaning of § 53a-169 (a) (2). . . . Read in context, § 53a-169 (a) (2) simply identifies another environment—a community residence—from which an unauthorized departure, or to which a failure to return, is possible and made culpable. . . . [Section] 53a-169 (a) (2) employs the term escape to contemplate an unauthorized departure from, or failure to return to, a community residence." (Citations omitted; internal quotation marks omitted.) *State* v. *Lubus,* 216 Conn. 402, 409, 581 A.2d 1045 (1990).

Escape is a general intent crime. All that is necessary to prove the element of intent is that the defendant have the general intent to perform the acts that constitute the offense, namely, an unauthorized departure from, or failure to return to, a community residence.[6] See id., 408

---

[6] "General intent is the term used to define the requisite mens rea for a crime that has no stated mens rea; the term refers to whether a defendant intended deliberate, conscious or purposeful action, as opposed to causing a prohibited result through accident, mistake, carelessness, or absent-mind-

("escape" in § 53a-169 [a] [2] incorporates misconduct commonly understood as unauthorized departure from custodial constraints); see also 27A Am. Jur. 2d 789, Escape § 3 (2008) ("the culpable mental state for escape from custody is established if the defendant acted purposely or knowingly"); 30A C.J.S. 495–96, Escape § 10 (2007) (mental element required is "an intent to escape or to avoid legal confinement or to evade the due course of justice"; specific intent not required); 4 C. Tortia, Wharton's Criminal Law (15th Ed. 1996) § 638, p. 449 (required mental state for escape is "intent to accomplish without authority a prisoner's liberation from legal custody").

Under the facts of this case, the charged act or acts constituting escape include the unauthorized departure from or failure to return to the defendant's designated place of confinement, 70 Highland Avenue. See *State v. Lubus*, supra, 216 Conn. 409. It is uncontested that the defendant physically absented himself from his designated place of confinement, i.e., 70 Highland Avenue. There was testimony from Leland Blunt indicating that the defendant voluntarily chose to leave rather than to abide by the Blunts' wishes regarding Jim.[7] Leland Blunt

edness." (Internal quotation marks omitted.) *State v. Larsen*, 117 Conn. App. 202, 208 n.4, 978 A.2d 544, cert. denied, 294 Conn. 919, 984 A.2d 68 (2009).

[7] Leland Blunt explained, on direct examination by defense counsel, that the defendant "was talking about how [Jim] had no place to go [and that] the baby was in the hospital. . . . And I said . . . well, the baby can stay here. [Jim] has to go. We got into a heated discussion, and I said, well, pack your bags and get out." Leland Blunt later clarified that "exactly what" he told the defendant was that "[i]f he could not abide by [Arlene Blunt's] and my decision, then pack your bags and get out." On cross-examination, Leland Blunt testified that the "problem" he was having was with Jim, not the defendant. The state inquired: "[The defendant] didn't have to get out, did he?" In response to this question, Leland Blunt stated: "[I]f [the defendant] did not abide by [Arlene Blunt's] and my decision, yes, he had to get out."

To the extent that there is conflicting evidence in the record, the jury was not required to credit it. "[E]vidence is not insufficient . . . because it is conflicting or inconsistent. . . . It is the [jury's] exclusive province to weigh the conflicting evidence and to determine the credibility of witnesses. . . . The [jury] can . . . decide what—all, none, or some—of a witness'

testified that "exactly what" he told the defendant was that "[i]f he could not abide by [Arlene Blunt's] and my decision, then pack your bags and get out." The jury reasonably could have found that the defendant's sponsor did not require him to leave the residence, and, thus, the defendant was not faced with a situation in which he was forced to violate the residency condition of his transitional supervision in order to comply with his sponsor's wishes.

Furthermore, the jury reasonably could have concluded that the defendant's conduct after he left 70 Highland Avenue further evidenced his intent to escape. The defendant and Buster both testified that after June 30, 2003, the defendant stopped reporting to her in person.[8] Moreover, the defendant physically absented himself from the state shortly after leaving the Highland Avenue residence and went to Arizona.[9] He did so without Buster's knowledge or permission. The jury reasonably could have found that the defendant's leaving the designated community residence, failure to return to the community residence and subsequent departure to Arizona demonstrated his intent to escape from the custody of the commissioner.[10]

---

testimony to accept or reject." (Internal quotation marks omitted.) *State* v. *Wortham*, 80 Conn. App. 635, 642, 836 A.2d 1231 (2003), cert. denied, 268 Conn. 901, 845 A.2d 406 (2004).

[8] The defendant testified that he "attempt[ed]" to contact Buster after leaving the Highland Avenue residence but admitted, however, that he stopped reporting to her in person after June 30, 2003. Buster testified that to the best of her knowledge, the defendant made no attempt to contact her. She testified that she left telephone messages in an attempt to contact the defendant after he stopped reporting but that she did not receive any return telephone calls from the defendant.

[9] The defendant and Jim left 70 Highland Avenue around July 6, 2003. From Jim's testimony, the jury could have inferred that the defendant and Jim went to Arizona in late July, 2003. Jim testified that they stayed at a hotel for "almost a week and a half," and then went to a condominium where they stayed for a "few days" before leaving for Arizona.

[10] The act of deliberately leaving custodial restraint constitutes the gravamen of the crime of escape. If a defendant "merely" violates a condition of transitional supervision, he could immediately be returned to a correctional

For the foregoing reasons, there was sufficient evidence to support the defendant's conviction of escape.

The judgment is affirmed.

In this opinion the other judges concurred.

institution. See General Statutes § 18-100. A defendant can violate a condition of release without escaping, but the fact that one act violates a condition of release, of course, does not mean that the act is not also an escape. On the facts of this case, the designated community residence was the only physically named place from which the defendant technically could escape from the custody of the commissioner.