STATE OF CONNECTICUT *v.* KADAFIE FERNANDEZ
(AC 34319)

DiPentima, C. J., and Lavine and Bear, Js.

Argued September 21—officially released November 27, 2012

*William B. Westcott,* for the appellant (defendant).

*Linda Currie-Zeffiro,* assistant state's attorney, with whom, on the brief, were *John C. Smriga,* state's attorney, and *Cornelius P. Kelly,* senior assistant state's attorney, for the appellee (state).

*Opinion*

LAVINE, J. The defendant, Kadafie Fernandez, appeals from the judgment of conviction, rendered after a jury trial, of murder in violation of General Statutes

§ 53a-54a (a).[1] On appeal, the defendant claims that the court improperly denied his motion for a new trial that was predicated on alleged prosecutorial impropriety. We affirm the judgment of the trial court.

This appeal arises from the death of Blake Moore, who was shot at approximately 3:10 a.m. on January 1, 2008, on Pembroke Street in the city of Bridgeport. The jury reasonably could have found the following facts.

Between 10 and 10:30 p.m. on December 31, 2007, Rogsbert King was walking south on Pembroke Street near its intersection with Ogden Street. At that time, she saw the defendant, who was carrying a shotgun, exit a convenience store on the opposite side of Pembroke Street.

Between 9 and 10 p.m. that evening, Moore and his girlfriend, Thea Robinson, arrived at the apartment of Jonalee Lacend, who lived at the corner of Pembroke and Shelton Streets. Moore, Robinson and Lacend left together to attend a New Year's Eve party in Stratford and returned together at approximately 1 a.m. on January 1, 2008. Thereafter, the three of them and others congregated on the corner of Pembroke and Shelton Streets until approximately 2:30 a.m. when they went into Lacend's apartment. During the time they were on the corner, two men walked by and one of them bumped into Robinson. Robinson and the man exchanged unpleasant words.

At approximately 3 a.m., Moore and Robinson prepared to leave Lacend's apartment. Moore exited Lacend's apartment and crossed Shelton Street where Robinson's car was parked. Robinson was standing on Shelton Street when two men walked past her. When they were approximately ten feet away, the men

---

[1] The defendant received a sentence of sixty years in the custody of the commissioner of correction.

stopped and turned toward Robinson. One of the men took a shotgun from under the long coat he was wearing and fired two shots into the air in Moore's direction.[2] Robinson heard a pumping action between the shots, indicating to her that it was a pump action shotgun. Moore ran from the scene and turned south on Pembroke Street toward Jane Street. The man who had produced and fired the shotgun handed it to the other man and stated "get him, get him." The man took the shotgun and pursued Moore. Later, at the police station, Robinson identified the defendant as the man who took the shotgun and pursued Moore onto Pembroke Street.

Marlboro Court is a public housing complex on the west side of Pembroke Street between Shelton and Jane Streets. For a number of hours on the night in question, Elizabeth Campos had been sitting near the interior stairwell of Marlboro Court smoking crack cocaine. When Campos heard a gunshot, she opened the stairwell door and saw Moore running south on Pembroke Street toward Jane Street. She also saw the defendant, whom she knew from the neighborhood and who was facing her, carrying a shotgun and running on the sidewalk behind Moore. More than once, she saw the defendant "click it back," referring to the shotgun, and shoot Moore.[3] Moore collapsed on the ground, and the defendant turned and headed east on Jane Street. Campos went to a pay telephone and called 911.[4]

---

[2] Lacend, who was in bed, heard two shots outside her apartment. She got up, looked out her window and saw two men standing on the corner of Shelton and Pembroke Streets.

[3] Campos did not report what she saw to the police immediately. Fulgencio Rodriguez, with whom Campos had been smoking crack, told Detective Heitor Teixeira that Campos witnessed the shooting. After Campos had been arrested on an unrelated matter on January 25, 2008, Heitor Teixeira questioned her about the Moore shooting. Campos provided a written statement regarding what she saw and selected the defendant's photograph from a photographic array, identifying him as the shooter.

[4] Moore was transported to Bridgeport Hospital, where he died shortly before 4 a.m. An autopsy revealed that he died from three wounds inflicted by a large caliber weapon, later determined to be a shotgun. The medical

Carmelo Rivera was a high school student living with his family on the third floor of Marlboro Court. He spent New Year's Eve and the early hours of New Year's Day in his brother's bedroom talking on a portable telephone to his friend. He was smoking cigarettes near an open window that faced Jane Street. Rivera had seen a man walking on Jane and Pembroke Streets thirty to sixty minutes prior to the shooting. The man, later identified as the defendant, was carrying something big under his white hoodie. While he was looking out the window, Rivera saw the man, then in the company of another man, turn from Jane Street onto Pembroke Street, as well as Moore walking south in the middle of Pembroke Street. One of the men took out a shotgun and fired three shots at Moore. In his statement to police, Rivera stated that Moore was first shot in the leg. The two men then stood over Moore and shot him twice more. Rivera dialed 911 to report the shooting.[5]

Detective Paul Ortiz secured the crime scene to collect evidence. He recovered three spent shotgun shells on the sidewalk on the east side of Pembroke Street close to its intersection with Jane Street. Moore's body was found in the roadway on Pembroke Street, on the side of the street close to the walkway where the shells were recovered.

On January 11, 2008, Detective Heitor Teixeira went to the home of Sandi Teixeira.[6] The defendant, who was then incarcerated on an unrelated conviction, had

examiner described Moore's wounds as (1) a through-and-through wound with an entry at the back of the neck and an exit at the right shoulder, (2) an entry at the right shoulder traveling down and to the rear with the slug resting near the spine and (3) an entry at the lower portion of the right leg traveling upward shattering the tibia with the slug coming to rest in the thigh just under the skin.

[5] Rivera and his friends knew how to move between Shelton and Jane Streets without traversing Pembroke Street by passing though driveways and backyards. He himself had done so.

[6] Heitor Teixeira and Sandi Teixeira are not related to one another.

informed department of correction personnel that Sandi Teixeira was his contact person.[7] Sandi Teixeira told the detectives that she had been romantically involved with the defendant on and off for several years, but that she had not seen the defendant on New Year's Eve. At 4:40 a.m. on January 1, 2008, the defendant, who was standing in Sandi Teixeira's backyard, called her from a cellular telephone she had lent him. Sandi Teixeira and the defendant went to a hotel in Milford where they remained until approximately noon, when Sandi Teixeira then took the defendant to his grandmother's house on Pembroke Street. That evening, Sandi Teixeira and the defendant checked into a hotel in Fairfield, where they remained for several days.

When Heitor Teixeira first met with Sandi Teixeira, she produced a cellular telephone from which the detective downloaded a photograph of the defendant that had been taken on January 1, 2008. Sandi Teixeira met with Heitor Teixeira again on January 20, 2008, and identified a 551 number that appeared frequently on her cellular telephone as the number of the cellular telephone she had lent to the defendant (551 phone). The United States marshal's office utilized the records of the 551 phone to plot its location throughout the evening of December 31, 2007, and into the morning of January 1, 2008. The records disclosed that the 551 phone was used during those hours in Trumbull at approximately 10:46 p.m. and in New Haven one and one-half hours later. The records further revealed that the 551 phone was used sequentially in West Haven, Milford and Bridgeport, where it was used at 2:56 a.m.

After the jury found the defendant guilty of murder, the defendant filed an amended motion for a new trial

---

[7] There was testimony that the defendant had been convicted of operating a motor vehicle while intoxicated and operating with a suspended license. He commenced a forty-five day jail sentence on January 5, 2008.

and a motion for a judgment of acquittal. The court issued its decision on the motions in a memorandum of decision on February 4, 2010. The court stated that the "basic claim in both motions is that the jury's verdict was inconsistent with what the defense asserts to be indisputable physical and ballistic evidence and that the prosecutor engaged in misconduct."[8] When ruling on the defendant's amended motion for a new trial, the court made the following findings of fact that are relevant to the issues on appeal.

The court found that Pembroke Street generally runs in a north-south direction. Jane, Shelton and Ogden Streets run in an east-west direction and intersect with Pembroke Street. Proceeding from the south to the north on Pembroke Street, one first crosses Jane Street then Shelton Street and then Ogden Street. The ambulance personnel found Moore lying on Pembroke Street near its intersection with Jane Street. The body was lying next to a Toyota automobile that was parked on the east side of Pembroke Street. The police found three twelve gauge shotgun shells on the sidewalk on the east side of Pembroke Street. A pump action shotgun ejects shells to the right;[9] the murder weapon, however, was never recovered.

The court also found that at approximately 3 a.m., Robinson and Moore left Lacend's house located at the corner of Pembroke and Shelton Streets. Moore walked ahead of Robinson toward her car that was parked on

---

[8] The court denied the motion for a judgment of acquittal, but the defendant has not raised any claims in that regard on appeal.

[9] Marshall Robinson, the state's firearms examiner, testifying in response to a question about whether a shell casing ejected from a pump action shotgun goes right, stated: "It's going to come out the right side of the gun. Whether it goes forward, straight to the right or to the rear or up, I don't know, but it's going to come out the right side of the gun and go somewhere." The defendant claims that the only way the ejected shotgun shells could have been found on the sidewalk on the east side of Pembroke Street was if the shotgun had been pointing north toward Shelton Street when fired.

Shelton Street. Robinson saw two men approach Moore. One man removed a shotgun from under his coat and fired two shots in Moore's direction, but into the air. Between shots, the man racked the shotgun in a fashion consistent with a pump action shotgun. After firing the shots, the man passed the gun to the second man and told the second man to "get him, get him." Moore fled down Pembroke Street and was pursued by the second man. Robinson lost sight of them. Initially, she ran to Lacend's door and, then, across the street to her car. She heard more shots. Robinson identified the defendant as the second man who pursued Moore.

Campos was in a multifamily dwelling known as Marlboro Court when she heard a shot and looked out the front door of the building. She saw Moore running in her direction on Pembroke Street, and the defendant was chasing him. The defendant was on the sidewalk. After she saw Moore collapse in the street, Campos saw the defendant go to Moore and shoot him again. The defendant then left the scene.

Rivera also was in Marlboro Court at the time of the shooting. He was looking out a window that overlooked the intersection of Pembroke and Jane Streets. He saw the shooter and another person confront Moore near the corner. Rivera saw Moore come down the middle of Pembroke Street and the shooter shoot Moore. At the time of the shooting, the shotgun was facing in a generally northerly direction. When police showed Rivera a photographic array, he picked out two photographs that he said "strongly resembled the shooter." One of those photographs was of the defendant. At trial, Rivera testified that the other photograph "more strongly resembled" the shooter.

With respect to the defendant's motion for a new trial, the court analyzed the defendant's claims regarding prosecutorial impropriety as follows. The defendant

claimed that the prosecutor made arguments that were contrary to the evidence and encouraged the jury to speculate, failed to present Rivera as a state's witness and unfairly challenged Rivera's testimony on cross-examination.

The court did not find that the prosecutor made arguments that were contrary to the evidence or that encouraged the jury to speculate about facts not in evidence. The court found that, during closing argument, the prosecutor pointed out a time gap between Robinson's observations regarding Moore's flight and those of Campos regarding the shooting. The court stated that the prosecutor argued that it was possible that during that period of time, in an effort to escape, Moore could have run into the backyards of buildings on Pembroke Street and then returned to the street.[10] The court further stated that if Moore had done so, the prosecutor argued that Moore's maneuvers could have resulted in the shooter's being in a position south of Moore's at the time the fatal shots were fired.

With respect to legal precedent, the court distinguished the facts of *State* v. *Therrien*, 117 Conn. App. 256, 978 A.2d 556, cert. denied, 294 Conn. 913, 983 A.2d 275 (2009), which the defendant relied on for a new trial, from the facts of the present case. In *Therrien*,

---

[10] In its brief on appeal, the state argues that the court misconstrued the prosecutor's argument. The court found that the prosecutor stated that "the victim could have run into the backyards of the buildings on Pembroke Street and then returned to the street." The transcript indicates that the prosecutor argued, in part: "Perhaps . . . Moore ran down the street, perhaps he had a lead on the defendant and the defendant decided to go another route—behind the yard—there's been testimony by the police that there's ways to get from Jane Street or from some of those homes on Pembroke Street to Shelton, to Jane, and vice versa. . . . Rivera himself indicated that there were ways to get there, that he himself had done that as well." We see no harm. The important evidence, and the inferences to be drawn from the evidence, is that someone who knew how to do it could move from Shelton Street to Jane Street without traversing Pembroke Street.

this court ordered a new trial because the prosecutor invited the jury to engage in "sheer speculation unconnected to [the] evidence." Id., 272. In the present case, the court found that the prosecutor did no more than suggest a permissible inference the jury could draw, if the jury chose to draw it. The prosecutor did not refer to any facts outside the record, as was the case in *Therrien*. The court also concluded that, if the prosecutor's argument was objectionable, it did not require a new trial, in view of the fact that the defendant did not object[11] and the court had instructed the jury with respect to inferences.[12]

With regard to the defendant's claim that the state did not call Rivera as a witness, the court found that the defendant offered no authority to support his assertion, and the court was unaware of any authority that requires the state, on penalty of a new trial, to call a particular witness. The court also found that it was not improper for the prosecutor to test Rivera's observations on cross-examination and to comment on his testimony during final argument. The defendant did not

[11] "A failure to object demonstrates that defense counsel presumably [did] not view the alleged impropriety as prejudicial enough to jeopardize seriously the defendant's right to a fair trial." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 51, 917 A.2d 978 (2007).

[12] In its charge, the court instructed in relevant part: "In reaching your verdict, you should consider all the testimony and exhibits received into evidence. Certain things, though, are not evidence and you may [not] consider them in deciding what the facts are. These include the following: arguments and statements by lawyers. The lawyers are not witnesses. What they have said in their closing arguments and at other times is intended to help you interpret evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls. . . .

"You may draw reasonable inferences from the facts in the case. The inferences which you draw, however, must not be from a guess upon the evidence, but they must be from a fact or facts which the evidence has established. In drawing inferences from established facts, you should use your reason and common sense. The inferences which you draw may be— must be logical and reasonable . . . ."

object to the prosecutor's final argument; see footnote 11 of this opinion; but attempted to use the introduction of Rivera's testimony to its tactical advantage by arguing forcefully that it was the defendant, not the state, who presented his testimony. The main point, the court found, was that the jury heard Rivera's testimony and gave it whatever weight it felt it deserved. In sum, the court found that the prosecutor did not engage in impropriety. Additional facts will be addressed as needed.

On appeal, the defendant claims that the court improperly denied his motion for a new trial because the prosecutor was guilty of prosecutorial impropriety by (1) pursuing a theory of liability that was inapposite to the physical evidence of the crime and (2) arguing facts not in evidence. We disagree.

"Appellate review of a trial court's decision granting or denying a motion for a new trial must take into account the trial judge's superior opportunity to assess the proceedings over which he or she has personally presided. . . . Thus, [a] motion for a new trial is addressed to the sound discretion of the trial court and is not to be granted except on substantial grounds. . . . In our review of the denial of a motion for [a new trial], we have recognized the broad discretion that is vested in the trial court to decide whether an occurrence at trial has so prejudiced a party that he or she can no longer receive a fair trial. The decision of the trial court is therefore reversible on appeal only if there has been an abuse of discretion. . . .

"In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *State* v. *Ouellette*, 110 Conn. App. 401, 416–17,

955 A.2d 582 (2008), aff'd, 295 Conn. 173, 989 A.2d 1048 (2010).

"To determine whether the court abused its discretion, we must determine whether prosecutorial impropriety deprived the defendant of a fair trial. [I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [impropriety] occurred in the first instance; and (2) whether that [impropriety] deprived a defendant of his due process right to a fair trial." (Internal quotation marks omitted.) *State* v. *John B.*, 102 Conn. App. 453, 462–63, 925 A.2d 1235, cert. denied, 284 Conn. 906, 931 A.2d 267 (2007). "The fairness of the trial and not the culpability of the prosecutor is the standard for analyzing the constitutional due process claims of criminal defendants alleging prosecutorial [impropriety]." (Internal quotation marks omitted.) *State* v. *Fauci*, 282 Conn. 23, 50, 917 A.2d 978 (2007). In this case, we conclude that the prosecutor did not engage in impropriety.

I

The defendant's first claim is that the court improperly denied his motion for a new trial in concluding that the prosecutor did not comment on matters not in evidence and did not encourage the jury to speculate on events not supported by the record. We do not agree.

The defendant's claim is premised on his belief that "[t]he state's theory of liability against [him] hinged on the testimony of . . . Robinson and . . . Campos, establishing by their testimony that the defendant chased [Moore] in a southerly direction down Pembroke Street and shot him as [the defendant] pursued [Moore] toward the point in the block where Jane Street crosses" Pembroke Street. The defendant claims that the prosecutor's argument was improper because the state was aware of, but did not call, Rivera who testified

that the shooter approached Moore from the south, not the north. The defendant argued that Rivera's version of the facts was the most likely and plausible interpretation given the location of the shotgun shell casings and Moore's body.

The prosecutor argued, in part, that Rivera's testimony does not make sense when evaluated alongside the testimony of other witnesses. The prosecutor stated that Rivera "had the individuals coming around Jane Street and . . . Moore walking down the street, whereas . . . Robinson has . . . Moore rounding the corner of Shelton on to Pembroke Street, running, with the defendant behind him. And as I indicated to you early on, we don't actually know what took place . . . on Pembroke between Shelton and Jane. Perhaps . . . Moore ran down the street, perhaps he had a lead on the defendant and the defendant decided to go another route—behind the yard—there's been testimony by the police that there's ways to get from Jane Street or from some of those homes on Pembroke Street to Shelton, to Jane, and vice versa. . . . Rivera himself indicated that there were ways to get there, that he himself had done that as well. . . .

"I'm not suggesting that . . . Rivera didn't see individuals in the area of Jane and Shelton, because I think it's substantially clear here that everybody ran from . . . Shelton down Pembroke toward Jane, and that there was testimony that individuals ran down Jane towards Hallett Street. We have that. As I said to you a moment ago, that we don't know what happened in between. As I said, perhaps . . . Moore had a lead on the defendant and the defendant took a different route to cut him off on Jane Street, and in fact, at that point in time that . . . Rivera sees those individuals . . . and they get into a point—maybe . . . Moore thinks he's safe at that point. Who knows what he did. He could've run down all the way to Jane Street, run back

and thought better of it, and then start walking back down Pembroke—again—towards Jane when he was confronted by the defendant or somebody else that was with the defendant.

"As I said to you in my opening remarks, *we don't exactly know what took place on Pembroke Street between Jane and Shelton.* We do have a situation here, ladies and gentlemen, that you have to assess the credibility of all the witnesses here, what they said, what they did at the point in time that they gave statements and they spoke to the police, how they acted, reacted, whether they answered questions, whether they didn't answer questions, what interest do they have in the outcome of the case while they're here in court." (Emphasis added.)

In denying the defendant's motion for a new trial regarding the alleged improper argument, the court found no impropriety, stating: "It is true that the prosecutor, during argument, pointed out that there was a time gap between the observations of . . . Robinson and those of . . . Campos. The prosecutor further argued that it was possible that during that gap, in an effort to escape, [Moore] could have run into the backyards of the buildings on Pembroke Street and then returned to the street. These maneuvers, the prosecutor asserted, could have resulted in the shooter being in a position south of [Moore] at the time of the fatal shots. . . . [T]he prosecutor's argument did no more than suggest a permissible inference that the jury could draw if it chose. It did not involve the sort of blatant reference to facts outside the record that was the problem in [*State* v. *Therrien,* supra, 117 Conn. 256]. Moreover, even if that argument was objectionable, it does not necessitate a new trial—particularly in light of the lack of objection and the court's jury instructions on inferences."[13]

---

[13] See footnote 10 of this opinion.

On appeal, the defendant argues that there was no indication that the shooter fell behind in his pursuit of Moore and turned to an alternative route and that "the state must deal with the case it has without turning to guesswork to explain the contradictions presented by [Rivera]. . . . Robinson claimed she saw the defendant chase [Moore] down Pembroke Street; and . . . Campos said she saw [Moore] running down Pembroke when he was shot [by] the defendant who was in pursuit behind him. This was the case [the state] elected to put on and prove. The extended scenarios offered to explain away Rivera's testimony were completely devoid of support in actual evidence." In other words, the defendant claims that the prosecutor was not permitted to ask the jury to draw reasonable inferences about what happened during the period of time when Robinson saw Moore run down Pembroke Street, and Campos and Rivera saw him get shot, even though the testimony of each of those individuals was before the jury. The defendant asserts that *State* v. *Fauci*, supra, 282 Conn. 50–54, supports his position.

This case and *Fauci* are distinguishable. In *Fauci*, the prosecutor, during rebuttal, used the name of a woman not in evidence, which was improper, and asked the jury to conclude that she was the "mystery woman." Id., 48–50. Our Supreme Court concluded that there was no evidence by which the jury could conclude logically that the woman was "the mystery woman." Id., 50. Here, the prosecutor told the jury on more than one occasion that no one knew what happened between the time Robinson saw Moore run down Pembroke Street and the time that Campos and Rivera saw the defendant shoot him. The prosecutor argued to the jury what it reasonably could infer from the conflicting testimony of Campos and Rivera: Campos testified that Moore was shot from the north and Rivera testified that he was shot from the south. The critical evidence is

that both Campos and Rivera saw the defendant shoot Moore.

Officer Roderick Doda, who patrolled the east end of Bridgeport, testified that it was possible to travel by foot from Shelton Street south to Jane Street through backyards. Rivera testified that he and his friends had done so.

The gist of the defendant's argument seems to be that because the state did not call Rivera as its own witness, the evidence that the defendant elicited from him should not have been used by the prosecutor during his final argument. All of the evidence before the jury, regardless of who presented it, was available for the prosecutor to argue and for defense counsel to dispute. It was for the jury to determine which version of the facts to believe. See *State* v. *Pickel*, 121 Conn. App. 443, 449 n.7, 998 A.2d 125, cert. denied, 297 Conn. 924, 995 A.2d 169 (2010). It is true that the line separating speculation from the drawing of reasonable inferences is sometimes a wavy one. But in this case, we conclude that it was not improper for the prosecutor to ask the jury to consider logical inferences that could be drawn from all of the evidence.[14]

II

The defendant claims that it was improper for the prosecutor to fail to call Rivera as a witness for the state. We do not agree.

The defendant argues that the prosecutor's failure to call Rivera under the unique circumstances of this case violates the common law-doctrine of *State* v. *Guilfoyle*,

---

[14] To the extent that the defendant claims that the state pitted theories of liability against one another, the state consistently pursued the charges against the defendant as the person who shot Moore. The state never asserted as an alternative legal theory that the defendant had been an accessory. The prosecutor merely argued how the defendant could have shot Moore given the evidence before the jury. The defendant's legal theory claim therefore fails.

109 Conn. 124, 134, 145 A. 761 (1929), even though he acknowledges that the modern interpretation of the doctrine requires only that the state ensure that the defendant is aware of any witness tending to aid in ascertaining the truth as to the relevant facts.

In *Guilfoyle*, our Supreme Court stated "the duty of the representative of the [s]tate dictates that the testimony of every available witness tending to aid in ascertaining the truth as to facts relevant to the inquiry be laid before the trial court, irrespective of whether it be consistent with the contentions of the prosecution." Id. More recently, our Supreme Court has stated that "the *Guilfoyle* rule is one of *disclosure*, akin to that of *Brady* v. *Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963) . . . ." (Emphasis added.) *State* v. *Tomas D.*, 296 Conn. 476, 510, 995 A.2d 583 (2010), overruled in part on other grounds by *State* v. *Payne*, 303 Conn. 538, 562–64, 34 A.3d 370 (2012). There is no *Guilfoyle* violation where the defendant is aware of a witness and the potential substance of the witness' testimony and could take action to procure the testimony of the witness. See id.[15]

In this case, the prosecutor did not deprive the defendant of a fair trial by not calling Rivera, whose ability or willingness to recall certain facts about Moore's death had become equivocal prior to trial.[16] Defense counsel knew of Rivera, spoke with him on more than

[15] In *Tomas D.*, the defendant claimed that the prosecutor engaged in prosecutorial impropriety by releasing a witness from a subpoena prior to informing defense counsel. *State* v. *Tomas D.*, supra, 296 Conn. 490, 494. Defense counsel stated that he was unable to subpoena the witness during trial as the witness had left the jurisdiction for vacation; id., 491; but he acknowledged that the substance of the witness' testimony already was in evidence. Id., 495. Moreover, our Supreme Court determined that the defendant in *Tomas D.* had failed to exercise due diligence in "exercising his sixth amendment rights"; id., 500; to compel the presence of the witness. Id.

[16] On cross-examination by the prosecutor, Rivera testified, in part, as follows:

"Q. Now did you ever see that individual who was walking up and down Jane Street before?

one occasion prior to trial, knew the substance of his testimony and presented him as a defense witness. Our conclusion that the prosecutor did not deprive the defendant of a fair trial by not calling Rivera to testify is consistent with this court's decision in *State* v. *LaFountain*, 127 Conn. App. 819, 835–41, 16 A.3d 761 (state had no obligation to produce LaFountain's police statements until LaFountain met her burden of production regarding defense of duress; see General Statutes § 53a-12 [a]), cert. denied, 301 Conn. 921, 22 A.3d 1281 (2011). In this case, the defendant knew the substance of Rivera's testimony and put it before the jury. The role of the jury is to determine what testimony to believe. The defendant therefore was not deprived of a fair trial by the prosecutor's failure to have Rivera testify during the state's case.

The judgment is affirmed.

In this opinion the other judges concurred.

---

"A. Well—

"Q. Before that day?

"A. Possibly like he looks like any other common person you would see on the street so I might have, I may have not.

"Q. Do you recall telling the police that you've seen him before?

"A. Yes.

"Q. Okay. So did you see him before that day?

"A. No, I said I could have or may have. Now when I gave that police report, like I—I was pretty sure [that] I had but now I can't remember.

"Q. Now you can't remember?

"A. Yes.

"Q. Do you recall telling the police that you had seen him walking up and down the street for about three or four days?

"A. Yes, I think I did.

"Q. Okay. But, as you sit here today, you don't independently remember that, do you?

"A. No."