******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* WILLIAM PAGAN
(AC 35994)

Sheldon, Prescott and Harper, Js.

*Argued January 13—officially released July 21, 2015*

(Appeal from Superior Court, judicial district of
Hartford, Vitale, J.)

*Janice N. Wolf*, assistant public defender, for the
appellant (defendant).

*Melissa L. Streeto*, senior assistant state's attorney,
with whom, on the brief, were *Gail P. Hardy*, state's
attorney, and *Chris Pelosi*, senior assistant state's attor-
ney, for the appellee (state).

*Opinion*

HARPER, J. The defendant, William Pagan, appeals from the judgment of conviction, rendered after a jury trial, of one count of assault in the first degree in violation of General Statutes § 53a-59 (a) (1). On appeal, the defendant claims that: (1) there was insufficient evidence to establish that he intended to cause the victim serious physical injury, which is an essential element of assault in the first degree as charged in this case; (2) the trial court improperly admitted the testimony of a domestic violence expert to explain why certain victims of domestic violence initially fail to name their abusers when reporting injuries resulting from domestic violence; and (3) the prosecutor made improper remarks in closing argument by arguing facts not in evidence, impugning defense counsel's integrity, and bolstering the credibility of the victim, in violation of the defendant's right to a fair trial. We affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The victim, Tashawna Gamble, lived with her mother, Johnnie Partin, in an apartment in Hartford. Gamble began dating the defendant approximately four months before the incident that gave rise to the present appeal. Partin disliked the defendant, and did not permit him inside her apartment while she was home.

Between 4 and 5 p.m. on September 30, 2010, the defendant called Gamble and asked her for the personal identification number (PIN) for her debit card so that he could use some of her money to repair her car's brakes. Gamble refused to give him the PIN because once before when she had given him the PIN to another bank card, he used it without her permission to withdraw $900 from her bank account. Upon this refusal, the defendant became upset with Gamble and they argued over the telephone.

After Gamble left her place of employment at 6 p.m., she picked up the defendant at a nearby housing project and then drove him to her apartment. Her mother was not at home. After the defendant and Gamble entered her bedroom, the defendant brought up Gamble's refusal to give him her PIN. When Gamble refused to argue with the defendant, he grew angry and left the room. When he returned, the defendant poured a flammable liquid onto Gamble's shoulder, arm and chest.[1] Gamble stood up from her bed, but the defendant stated that he was not finished talking to her and she sat down. After Gamble sat back down on the bed, the defendant lit a small piece of paper. The defendant then used the burning paper to set Gamble on fire.

The flames spread quickly. Gamble screamed and ran into the bathroom, while the defendant followed her, shouting, "[o]h my gosh, oh my gosh, I didn't know it

was going to be like that," as he attempted to remove Gamble's burning shirt. Gamble asked the defendant to turn on the shower, but instead he left the bathroom. Although she was in pain, Gamble managed to get into the shower. When the defendant returned to the bathroom, Gamble asked him to call for emergency assistance. The defendant, however, wondered aloud what he should tell the dispatcher, and delayed calling for help. The defendant, who was on probation, stated that he did not want to return to jail and that he would say that Gamble had been smoking a cigarette. He continued to delay calling for help. Gamble then asked the defendant to call her cousin. As soon as he left to do so, she called emergency assistance herself.

Gamble told the dispatcher that she had been smoking a cigarette, which she had dropped on herself, starting a fire. When the defendant returned to the bathroom and learned that Gamble had called for help, he stated that they "didn't have no whole legitimate reason of what happened . . . ." The defendant instructed Gamble to tell emergency responders that she had been using nail polish remover and lit a cigarette, which she had dropped into her lap, starting the fire.[2] When the emergency responders arrived, the defendant opened the door, identified himself and Gamble, and stated that Gamble had suffered a burn. Gamble told emergency responders, as the defendant had instructed her, that she had burned herself by accidentally dropping a cigarette. She then was transported to Saint Francis Hospital and Medical Center in Hartford for treatment.[3]

During Gamble's hospitalization, she did not reveal to anyone that the defendant was responsible for her injuries. One reason she did not do so was because she was being given high doses of pain medication and could not communicate effectively. Another reason, however, was that she was afraid that the defendant might attempt to harm her mother. The defendant was driving Gamble's motor vehicle, and had keys to her apartment. Although the defendant never visited Gamble in the hospital, Partin claimed that he repeatedly drove by the apartment at night and called her, asking questions about Gamble.

After being released from the hospital, Gamble told her mother the truth about what had occurred and that the defendant was responsible for her injuries. Partin had never believed Gamble's initial story because Gamble does not smoke. She encouraged Gamble to report the incident to the police, which she did on November 15, 2010. Subsequently, the defendant was arrested.

On November 1, 2012, the defendant was charged by long form information with one count each of assault in the first degree in violation of § 53a-59 (a) (1), assault in the first degree in violation of § 53a-59 (a) (3), and assault in the second degree in violation of General Statutes § 53a-60 (a) (3). Following a jury trial, the

defendant was found guilty of intentional assault in the first degree in violation of § 53a-59 (a) (1).[4] The court rendered judgment in accordance with the verdict, sentencing the defendant to a term of seventeen years incarceration to be served consecutively to an unrelated sentence that he was then serving. This appeal followed.

I

The defendant first claims that there was insufficient evidence to support his conviction of assault in the first degree in violation of § 53a-59 (a) (1). Specifically, he argues that the evidence presented at trial was insufficient to establish, as an essential element of that offense, that he intended to cause Gamble serious physical injury. We disagree.

We begin with the well established principles that guide our review. "In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt  . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 593–94, 72 A.3d 379 (2013).[5]

Section 53a-59 provides in relevant part: "(a) A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person  . . .  by means of a deadly weapon or a dangerous instrument  . . . ."[6] As defined in General Statutes § 53a-3 (11), a person acts intentionally with respect to a result demanded in a statute defining an offense when his conscious objective is to cause the result as defined by the statute. See *State* v. *Perugini*, 153 Conn. App. 773, 780, 107 A.3d 435 (2014), cert. denied, 315 Conn. 911, 106 A.3d 305 (2015). We have long recognized that "direct evidence of the accused's state of mind is rarely available. . . . Therefore, intent is often inferred from conduct  . . .  and from the cumulative effect of the circumstantial evidence and the rational inferences drawn therefrom." (Internal quotation marks omitted.) *State* v. *Hedge*, 297 Conn. 621, 658–59, 1 A.3d 1051 (2010); *State* v. *Silva*, 285 Conn. 447, 460, 939 A.2d 581 (2008); *State* v. *Fagan*, 280 Conn. 69, 80–81, 905 A.2d 1101 (2006), cert. denied, 549 U.S. 1269, 127 S. Ct. 1491,

167 L. Ed. 2d 236 (2007).

In the present case, the jury was instructed in accordance with the definition of "serious physical injury," as defined in § 53a-3 (4). A "serious physical injury" is an "injury which creates a substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ." (Internal quotation marks omitted.) *State* v. *Mendez*, 154 Conn. App. 271, 277, 105 A.3d 917 (2014). Thus, to be convicted of assault in the first degree, there must be sufficient evidence presented for the jury to conclude beyond a reasonable doubt that the defendant seriously injured Gamble by creating a substantial risk of death, or that he caused serious disfigurement, or impairment of health or function of a bodily organ, while acting with the conscious objective of causing her such serious physical injury. See *State* v. *Perugini*, supra, 153 Conn. App. 780.

The defendant claims that the record contains insufficient evidence to establish his intent to cause Gamble to suffer a serious physical injury. We are not persuaded. The defendant does not argue that Gamble did not suffer a serious physical injury; he claims only that the evidence was insufficient to prove that he intended to cause her such an injury. The defendant's argument is based on an interpretation of Gamble's testimony that places him in the best possible light. He argues that he did not know that nail polish remover is flammable; that he did not intentionally light the flames; and that he was shocked by the injuries and leapt to Gamble's aid. The defendant, in short, attempts to portray himself as a Good Samaritan, rather than a person who intentionally set Gamble on *fire*.

The record contains substantial evidence in support of the state's claim that the defendant intended to cause a serious physical injury to Gamble. On the basis of the defendant's instructions to Gamble as to what to tell emergency responders, the jury reasonably could have inferred that he was aware that the nail polish remover he poured on Gamble was highly flammable. The jury also could have credited the testimony of Cesar Rodriguez, an investigator with the Hartford Fire Department, that the spill pattern on Gamble's shirt resulted from the deliberate pouring of a flammable accelerant on Gamble. Furthermore, the jury was free to infer that when the defendant deliberately held a burning paper close to Gamble's accelerant soaked clothing, his conscious objective was to set her on fire, which was the natural consequence of his voluntary conduct. See *State* v. *Serrano*, 123 Conn. App. 530, 544, 1 A.3d 1277 (2010) (jury may infer that defendant intends natural consequences of voluntary conduct), cert. denied, 300 Conn. 909, 12 A.3d 1005 (2011).

On the basis of these inferences, a reasonable juror could have concluded that the defendant's conscious

objective was to set Gamble on fire and cause her to suffer serious burns and their damaging consequences. As Richard Garvey, a surgeon, testified, the deliberate use of the accelerant resulted in injuries that if left untreated could have resulted in Gamble's death, and, in fact, caused serious burns over 20 percent of her body and resulting permanent injuries.

To the extent that the defendant challenges the sufficiency of these inferences to prove intent, on the basis of other inferences that could have been drawn by the jury from his claimed efforts to mitigate the harm to Gamble, we note that "the jury is not barred from drawing those inferences consistent with guilt and is not required to draw only those inferences consistent with innocence." (Internal quotation marks omitted.) *State* v. *Otto*, 305 Conn. 51, 74, 43 A.3d 629 (2012). "[I]t is beyond question that the trier of fact, here, the jury, is the arbiter of credibility. This court does not sit as an additional juror to reconsider the evidence or the credibility of the witnesses." (Internal quotation marks omitted.) *State* v. *Holmes*, 75 Conn. App. 721, 742, 817 A.2d 689, cert. denied, 264 Conn. 903, 823 A.2d 1222 (2003). We conclude, therefore, that the jury reasonably could have found that the defendant intended to cause a serious physical injury to Gamble by deliberately pouring an accelerant upon her and then igniting it.

## II

The defendant next claims that the court abused its discretion by admitting the testimony of a domestic abuse expert offered by the state. Specifically, the defendant argues that: (1) the trial court erred in failing to categorically preclude expert testimony regarding the misreporting or nonreporting of serious domestic abuse by first time victims of such abuse because the state did not connect the expert testimony to the contested issues in the case by adducing evidence of a history of domestic abuse between the defendant and Gamble; and (2) that even if such testimony was not categorically barred, the expert's testimony was irrelevant because the necessary evidentiary foundation for it was not laid. Because these claims were raised for the first time on appeal, we conclude that they were not properly preserved before the trial court and, as a consequence, we decline to review them.

The following additional facts are relevant to these claims. As part of its case-in-chief, the state called as a witness Penny Micca, an outreach advocate with Interval House, a domestic violence and abuse center located in Hartford. The state sought to qualify Micca as an expert witness. Outside the presence of the jury, and in response to a defense query as to the relevancy of Micca's testimony and her familiarity with the case, the state asserted that Micca had never met the victim but that her testimony would help the jury understand the general reasons for typical misreporting or nonre-

porting of serious domestic abuse by persons in intimate relationships who are first time victims of such abuse.

The defendant raised two specific objections to the admission of Micca as an expert witness: (1) the type of information that Micca would provide was within the ken of the average juror; and (2) Micca's testimony would result in an improper bolstering of Gamble's credibility as a witness, causing the testimony to be more prejudicial than probative. The trial court requested that the state make a proffer as to the testimony it sought to elicit from Micca and allowed the defendant to voir dire her. Micca testified about the general nature and circumstances of nontypical reporting by first time victims of domestic abuse. She specifically pointed to the severe trauma and shock that can occur from first time instances of abuse. Micca stated that a victim subjected to such trauma often feels denial, shame, and particularly extreme fear of future impacts on both themselves and their family and friends. Micca further testified that as a result of the trauma and the attendant feelings, victims will often fail to disclose the abuse, or take blame upon themselves. She finally indicated that she did not know Gamble and had not evaluated her or the veracity of her statements. Following the proffer, the court ruled, pursuant to *State* v. *Favoccia*, 306 Conn. 770, 800, 51 A.3d 1002 (2012), and *State* v. *Vega*, 259 Conn. 374, 788 A.2d 1221, cert. denied, 537 U.S. 836, 123 S. Ct. 152, 154 L. Ed. 2d 56 (2002), that the proffered expert testimony provided by Micca was not within the ken of the average juror, and, so long as she testified in generalities, was not improperly bolstering Gamble's credibility.

Following the ruling, defense counsel argued as follows:

"[Defense Counsel]: Judge, I understand the court's ruling. I'd just, to make sure the record's complete from my end, I would observe broadly that perhaps not all but several of the sex assault cases contain language—and I've paraphrased as a defense attorney something to the effect of sex assault cases are different and special, and the rules that apply other places sort of are held in [abeyance] in sexual assault cases because of the sort of private, discreet nature of a sex assault will allow things that we wouldn't necessarily allow other places. So, I'm not sure that it's fair to draw that reasoning into this particular case.

"The Court: What about the reasoning in cases regarding battered woman's syndrome?

"[Defense Counsel]: Judge, I understand those cases exist, I'm just saying to—

"The Court: Well, I mean, that's to the argument you're making in terms of it's not just limited to those kinds of cases or this type of testimony. I'm not saying

it's a battered woman's case because the foundation has not been laid for that, but in terms of what you're arguing now—

"[Defense Counsel]: Well, with that—in that sort of, you know, now we're beginning to talk about, you know, whether the witness is allowed to talk in terms of syndromes and other things, and I don't think that sort of foundation's been laid.

"The Court: All right. [State's attorney], obviously you're aware of [*Favoccia*] . . . being aware that that case does say that you cannot opine—ask the witness to opine about a particular complainant and whether that person's exhibited general characteristics, so that, based on what I heard and the proffer, did not occur, but I'm well aware of that, so I don't expect any deviation from the questions that you had asked [during your proffer] in connection with that case."

The defendant argues as a threshold matter that the more prejudicial than probative objection and the colloquy after the court's ruling together properly preserved the issues he seeks to raise on appeal. The state argues that both of the arguments raised as part of this claim was not properly preserved because the defendant did not object to the testimony on those grounds. We agree with the state and, thus, decline to review the defendant's claim.

"[T]he standard for the preservation of a claim alleging an improper evidentiary ruling at trial is well settled. This court is not bound to consider claims of law not made at the trial. . . . In order to preserve an evidentiary ruling for review, trial counsel must object properly. . . . In objecting to evidence, counsel must properly articulate the basis of the objection so as to appraise the trial court of the precise nature of the objection and its real purpose, in order to form an adequate basis for a reviewable ruling. . . . Once counsel states the authority and ground of [the] objection, any appeal will be limited to the ground asserted. . . .

"These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act. . . . Assigning error to a court's evidentiary rulings on the basis of objections never raised at trial unfairly subjects the court and the opposing party to trial by ambush." (Internal quotation marks omitted.) *State* v. *Cabral*, 275 Conn. 514, 530–31, 881 A.2d 247, cert. denied, 546 U.S. 1048, 126 S. Ct. 773, 163 L. Ed. 2d 600 (2005),

It is clear from the record that the defendant did not object to Micca's testimony on the grounds of relevance or lack of an adequate evidentiary foundation. When asked to articulate his specific objections by the trial court, the defendant stated that he objected specifically on the grounds that the testimony was within the ken of the jury, and was more prejudicial than probative

because it tended to bolster Gamble's credibility. The record reflects that the argument after the defendant's objections and the colloquy following the ruling on the objections were focused solely on these two grounds. Because the defendant did not specifically object on the grounds on which he now seeks review, he failed to preserve the objections adequately for review.

The defendant argues that when he objected that Micca's testimony was more prejudicial than probative, he implicitly objected to the testimony's relevance. This argument misconstrues the nature of relevance and more prejudicial than probative objections. As this court has previously stated, relevant evidence is "evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *State* v. *Clark*, 68 Conn. App. 19, 24, 789 A.2d 549 (2002), aff'd, 264 Conn. 723, 826 A.2d 128 (2003). As our Supreme Court has noted, the test for whether evidence is unjustly prejudicial requires us to determine "whether the prejudicial effect of *otherwise relevant evidence* outweighs its probative value . . . ." (Emphasis added.) *State* v. *Collins*, 299 Conn. 567, 587, 10 A.3d 1005, cert. denied,      U.S.      , 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011). An objection that evidence is more prejudicial than probative argues that regardless of the relevance of the evidence, it must be excluded due to the threat of an injustice were it admitted. See *State* v. *Paulino*, 223 Conn. 461, 477, 613 A.2d 720 (1992); C. Tait & E. Prescott, Connecticut Evidence (4th Ed. 2008) § 4.8.1, p. 142. For this reason, the two objections are separate and distinct, and an argument that Micca's testimony was irrelevant was not preserved by the defendant's general challenge that the testimony was more prejudicial than probative. See *State* v. *Allen*, 289 Conn. 550, 564, 958 A.2d 1214 (2008) (prejudice not measured by relevance but by impact of extraneous information).

The defendant additionally argues that his counsel's colloquy with the court following the court's ruling was sufficient to preserve the issues now raised on appeal. Our Supreme Court, however, addressed a similar circumstance in *Cabral*. In that case, the court did not consider a postruling colloquy on the applicability of case law to the stated objections as raising a new objection. *State* v. *Cabral*, supra, 275 Conn. 529 n.10. As in *Cabral*, the defendant in this case did not specifically raise an additional objection, nor did he deviate in his argument from his earlier stated objections. See id. Rather, he challenged only the court's reasoning in applying *Favoccia* and *Vega* to the ruling on his objection that the testimony was within the ken of the jury.

At no time did he object on the grounds that there was inadequate foundation to support the use of expert testimony for the purpose of explaining typical misreporting or nonreporting of serious domestic abuse by

persons who are first time victims of such abuse. Rather, the defendant noted that no foundation had been laid for a discussion by the witness about whether Gamble suffered from specific medical syndromes, such as battered woman's syndrome. The trial court agreed and noted that had Micca so testified, her testimony would have been precluded under *Favoccia*. It never considered whether a proper foundation had been laid for the entirety of Micca's testimony. Consequently, the record does not reflect that the colloquy sufficiently preserved the issue raised on appeal.

Finally, the defendant seeks review of this claim under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989). "In *State* v. *Golding*, [supra, 239–40], this court set forth four conditions that a defendant must satisfy before he may prevail, on appeal, on an unpreserved constitutional claim. Because a defendant cannot prevail under *Golding* unless he meets each of those four conditions, an appellate court is free to reject a defendant's unpreserved claim upon determining that any one of those conditions has not been satisfied." (Footnote omitted.) *State* v. *Brunetti*, 279 Conn. 39, 54, 901 A.2d 1 (2006), cert. denied, 549 U.S. 1212, 127 S. Ct. 1328, 167 L. Ed. 2d 85 (2007).

The defendant must show that the unpreserved issue is of constitutional magnitude that implicates a violation of a fundamental right as one of the four conditions that must be met to merit review under *Golding*. *State* v. *Elson*, 311 Conn. 726, 744, 91 A.3d 862 (2014). Our Supreme Court has noted, however, that an unpreserved claim regarding the admission of expert testimony does not raise a constitutional issue. See *State* v. *Toccaline*, 258 Conn. 542, 550–52, 783 A.2d 450 (2001). We are unconvinced by the defendant's claims to the contrary. "Putting a constitutional tag on a nonconstitutional claim will no more change its essential character than calling a bull a cow will change its gender." *State* v. *Gooch*, 186 Conn. 17, 18, 438 A.2d 867 (1982). We therefore decline to review the merits of the defendant's claim.

### III

Finally, the defendant claims that several statements made by the prosecutor during the closing argument were improper and deprived him of a fair trial. The defendant specifically challenges statements in which he claims the prosecutor discussed facts not in evidence, improperly disparaged the integrity of defense counsel, and attempted to influence the jury as to Gamble's credibility. We conclude that none of the challenged statements were improper.[7]

"[I]n analyzing claims of prosecutorial [impropriety], we engage in a two step analytical process. The two steps are separate and distinct: (1) whether [an impropriety] occurred in the first instance; and (2) whether

that [impropriety] deprived [the] defendant of his due process right to a fair trial. Put differently, [an impropriety is an impropriety], regardless of its ultimate effect on the fairness of the trial; whether that [impropriety] caused or contributed to a due process violation is a separate and distinct question . . . ." (Internal quotation marks omitted.) *State* v. *Andrews*, 313 Conn. 266, 279, 96 A.3d 1199 (2014); *State* v. *Stevenson*, 269 Conn. 563, 572, 849 A.2d 626 (2004).

"As we previously have recognized, prosecutorial [impropriety] of a constitutional magnitude can occur in the course of closing arguments. . . . When making closing arguments to the jury, [however] [c]ounsel must be allowed a generous latitude in argument, as the limits of legitimate argument and fair comment cannot be determined precisely by rule and line, and something must be allowed for the zeal of counsel in the heat of argument. . . . Thus, as the state's advocate, a prosecutor may argue the state's case forcefully, [provided the argument is] fair and based upon the facts in evidence and the reasonable inferences to be drawn therefrom. . . . Moreover, [i]t does not follow . . . that every use of rhetorical language or device [by the prosecutor] is improper. . . . The occasional use of rhetorical devices is simply fair argument. . . . Nevertheless, the prosecutor has a heightened duty to avoid argument that strays from the evidence or diverts the jury's attention from the facts of the case." (Internal quotation marks omitted.) *State* v. *Medrano*, 308 Conn. 604, 611–12, 65 A.3d 503 (2013).

A

The defendant first claims that the prosecutor made improper statements that were based on facts that were not in evidence. He specifically challenges portions of the prosecutor's closing arguments in which the prosecutor stated that: (1) the defendant gave first responders "a lot of information"; (2) the defendant placed nail polish remover bottles and ashtrays in Gamble's room; (3) Gamble was able to identify the nail polish remover based on smell; and (4) the defendant knew nail polish remover was flammable.[8] We disagree.

"It is well established . . . that a prosecutor, in fulfilling his duties, must confine himself to the evidence in the record. . . . Statements as to facts that have not been proven amount to unsworn testimony, which is not the subject of proper closing argument. . . . A prosecutor may invite the jury to draw reasonable inferences from the evidence; however, he or she may not invite sheer speculation unconnected to evidence." (Internal quotation marks omitted.) *State* v. *Jones*, 135 Conn. App. 788, 801, 44 A.3d 848, cert. denied, 305 Conn. 925, 47 A.3d 885 (2012).

By asserting that the defendant provided emergency responders a lot of information, the prosecutor was

inviting the jury to make reasonable inferences from the evidence at trial. As was established by both Lieutenant Dan Albani of the Hartford Police Department and Gamble, the defendant greeted the responders at the door, identified himself, and explained that Gamble was injured. The jury was thus free to conclude that the defendant provided the emergency responders with information about the circumstances of Gamble's injuries. The prosecutor's characterization of the information as "a lot" urged the jury to make a permissible reasonable inference. See *State* v. *Washington*, 155 Conn. App. 582, 604, 110 A.3d 493 (2015).

The prosecutor's statement that the defendant arranged Gamble's room with ashtrays and nail polish removers was also based on reasonable inferences drawn from the evidence. As the prosecutor noted in his closing argument, the defendant was the individual who invented the story that Gamble had spilled nail polish remover on herself, then lit herself on fire with a dropped cigarette. He also had the opportunity and motivation to arrange the room to reflect the version of events he wanted to portray as true. The jury may make reasonable inferences from circumstantial evidence. *State* v. *Russell*, 101 Conn. App. 298, 333, 922 A.2d 191, cert. denied, 284 Conn. 910, 931 A.2d 934 (2007).

Similarly, the prosecutor's statement that the defendant knew that nail polish remover was flammable was based on reasonable inferences from the evidence of record. We find unpersuasive the assertion by the defendant that the state never demonstrated that he had such knowledge, especially given how the defendant suggested to Gamble that the accelerant was nail polish remover and argued in his own closing that such knowledge was clearly marked on nail polish remover bottles so that anyone who used them would be aware of its properties.[9] As such, the prosecutor's statement was not only based on reasonable inferences drawn from the evidence, but it properly appealed to the jurors' common sense. See *State* v. *Andrews*, supra, 313 Conn. 304.

The defendant last argues that the prosecutor's statement that Gamble was able to identify the accelerant as nail polish remover "based on smell" was directly contradictory to Gamble's own testimony. The record belies the defendant's claims. Gamble noted that she smelled the liquid the defendant had poured on her, but did not identify the liquid as nail polish remover *at that time*. She did not testify, as the defendant asserts, that the liquid did not smell like nail polish remover. Gamble's testimony is ambiguous as to what the liquid smelled like, for she only stated that she was unable to identify it at the time she was doused, and did not realize it was nail polish remover until the defendant instructed her to tell others that it was nail polish remover. The prosecutor argued that it was the smell,

*as well as* Gamble's knowledge that her mother used nail polish remover and the defendant's own words asserting that the liquid was nail polish remover, that made her conclude that the defendant had doused her with that type of liquid.

When considering the prosecutor's statements, we must not consider them in a vacuum, but rather in their entire context. *State* v. *Angel T.*, 292 Conn. 262, 275, 973 A.2d 1207 (2009). The prosecutor's statement that Gamble was able to identify the liquid on the basis of its smell was at most a stretched inference from vague testimony and was immediately clarified as being part of an assumption that was based on multiple factors. Our Supreme Court has declined to afford the most damaging interpretations to ambiguous remarks by prosecutors when more reasonable interpretations exist. See *State* v. *Ciullo*, 314 Conn. 28, 48, 100 A.3d 779 (2014). As such, we conclude that the statement was not improper.

In all four statements challenged by the defendant, the prosecutor characterized the evidence in a manner that allowed the jury to draw reasonable inferences, which is within the bounds of propriety during closing argument. See *State* v. *Jones*, supra, 135 Conn. App. 800–801 ("[a] prosecutor may invite the jury to draw reasonable inferences from the evidence" [internal quotation marks omitted]). Although the defendant may disagree with the content of those inferences, that does not render the argument improper. See *State* v. *Andrews*, supra, 313 Conn. 304.

### B

The defendant next claims that the prosecutor improperly disparaged the integrity of defense counsel. Specifically, the defendant argues that the prosecutor's statements during rebuttal argument insinuated that defense counsel was not basing his argument on the evidence or was misrepresenting the evidence because the prosecutor indicated that he "was going to stick to the facts," and found the defendant's argument "inconceivable . . . ."[10] We are not persuaded that the statements were improper.

Although it is well settled that "[t]he prosecutor is expected to refrain from impugning, directly or through implication, the integrity or institutional role of defense counsel"; (internal quotation marks omitted) *State* v. *James E.*, supra, 154 Conn. App. 820–21; nothing in the present case suggests that the prosecutor's comments were disparaging. As defense counsel finished his closing argument, he postulated a series of alternative theories to the case, emphasizing that each might have occurred.[11] The prosecutor's statement in his rebuttal argument that he was "going to stick to the facts" served to focus the jury's attention on the evidence that the state wanted to highlight in response to defense coun-

sel's speculation as to the chain of events. See *State* v. *Holley*, 144 Conn. App. 558, 573, 72 A.3d 1279, cert. denied, 310 Conn. 946, 80 A.3d 907 (2013). The prosecutor's argument that the defendant's version of events was "inconceivable" was directed at the defendant's theory, not at defense counsel. These statements are permissible because they challenge the theory of defense, not counsel. *State* v. *Salamon*, 287 Conn. 509, 558, 949 A.2d 1092 (2008).

C

The defendant last claims that the prosecutor improperly commented on Gamble's credibility as a witness. See *State* v. *Luster*, 279 Conn. 414, 435, 902 A.2d 636 (2006). He contends that the prosecutor impermissibly bolstered Gamble's credibility with the jury by stating that Gamble's story made "perfect sense"; asking an improper rhetorical question about whether she seemed spiteful; and discussing his pretrial conversations with Gamble. We disagree.

We initially note that the portion of the prosecutor's argument in which he stated that Gamble's story made "perfect sense" did not impermissibly bolster her credibility.[12] When the prosecutor stated that Gamble's decisions made "perfect sense," he was addressing the reason she did not initially tell the police how she sustained her injuries. The characterization was grounded in the evidence the state elicited through both Gamble's testimony and expert testimony for the specific purpose of helping the jury to understand the behavior of victims of abuse. "It is well established that a prosecutor may argue about the credibility of witnesses, as long as [his] assertions are based on evidence presented at trial and reasonable inferences that jurors might draw therefrom." (Internal quotation marks omitted.) *State* v. *Ciullo*, supra, 314 Conn. 45.

We also conclude that the prosecutor did not act improperly by asking the jury a rhetorical question as to whether Gamble was spiteful.[13] By asking the question, the prosecutor encouraged the jury to consider the evidence and weigh the credibility of Gamble's testimony in context. To the extent that the prosecutor's argument encouraged the jury to draw inferences favorable to Gamble's credibility, its purpose was to ask the jurors to draw those inferences from the evidence. See *State* v. *Fauci*, 282 Conn. 23, 48, 917 A.2d 978 (2007); see also *State* v. *Thompson*, 266 Conn. 440, 465–66, 832 A.2d 626 (2003).

Finally, we conclude that the prosecutor's statement that he did not inappropriately coach Gamble came in direct response to the defendant's argument. The following additional facts are relevant to this claim. During her direct testimony, Gamble stated that during and after her hospitalization she felt "betrayed" by the defendant's actions. On cross-examination, the defen-

dant questioned her as follows:

"[Defense Counsel]: Now, you get out of the hospital. You tell the ladies and gentlemen of the jury you felt betrayed. Right?

"[Gamble]: Excuse me?

"[Defense Counsel:] You told them earlier *when you were talking with* [*the prosecutor*] *after you got out, you felt betrayed.* Right?

"[Gamble]: Yes." (Emphasis added.)

Defense counsel later argued in closing that the prosecutor had met with Gamble and coached her to ascribe her feelings of betrayal resulting from the defendant's actions. The defendant then suggested that in fact those feelings stemmed from an unrelated matter.[14] The prosecutor responded during rebuttal argument that, while he had met with Gamble before her testimony, he had not engaged in coaching, and rhetorically asked the jury whether Gamble should have felt anything other than betrayal, given the injuries she sustained.[15]

The defendant claims that the prosecutor's assertion that Gamble's meaning behind the word betrayed was unscripted resulted in an impermissible endorsement of Gamble's credibility.[16] Although the prosecutor acknowledged that he had spoken with Gamble, the statement was not a personal commentary on her reliability. On the contrary, the prosecutor attempted to counter the implicit assertion by the defendant that the prosecutor encouraged Gamble to lie about her feelings and motivations. Our Supreme Court "clearly has established the propriety of a prosecutor's comments on such motives, as long as the remarks are based on the ascertainable motives of the [witness] rather than the prosecutor's personal opinion." (Internal quotation marks omitted.) *State* v. *Long*, 293 Conn. 31, 45, 975 A.2d 660 (2009). The prosecutor's question as to what motive Gamble would have to lie about her emotions following her injuries was therefore not improper because it did not attempt to bolster Gamble's credibility through personal opinion. See id., 44. In sum, we conclude that none of the statements by the prosecutor during closing argument were improper.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] On the basis of the testimony of Lieutenant Cesar Rodriguez, an investigator with the Hartford Fire Department's fire marshal's office, the jury reasonably could have found that the pattern of burns on Gamble's shirt reflected a deliberate pouring of liquid rather than a spill, in part due to the widespread nature of the burns across the shoulder and arm rather than a localized amount of spillage. The nature of the burns did not reflect a person attempting to stop an accidental spill.

[2] Lieutenant Dan Albani of the Hartford Fire Department smelled the distinctive odor of nail polish remover or acetone when he entered Gamble's apartment in response to her call. He and Jill Kidik, an officer with the Hartford Police Department, both saw a nearly empty bottle of nail polish remover in Gamble's bedroom.

[3] Gamble suffered third degree burns across more than 20 percent of her

body, from her chin to her midriff and across her left shoulder and arm, and received skin grafts to 20 percent of her body. She developed infections that required further surgical intervention. As a result of the amount of time she was hospitalized, she developed blood clots in her legs, which permanently impaired her left leg. Her left arm has reduced functionality. She has permanent scarring due to her injuries, which require ongoing physical therapy. Without treatment, Gamble's injuries likely would have resulted in her death.

[4] As a result of its guilty verdict on the charge of assault in the first degree in violation of § 53a-59 (a) (1), the jury did not deliberate or return a verdict on the other two charges.

[5] We note that "[a]lthough the defendant did not preserve [his] claim at trial, all sufficiency of evidence claims are reviewable on appeal because such claims implicate a defendant's federal constitutional right not to be convicted of a crime on insufficient proof." *State* v. *Miles*, 132 Conn. App. 550, 559, 32 A.3d 969 (2011), cert. denied, 303 Conn. 934, 36 A.3d 692 (2012).

[6] "Assault in the first degree is a specific intent crime. . . . It requires that the criminal actor possess the specific intent to cause physical injury to another person." (Internal quotation marks omitted.) *State* v. *James E.*, 154 Conn. App. 795, 804, 112 A.3d 791 (2015); *State* v. *Sivak*, 84 Conn. App. 105, 110, 852 A.2d 812, cert. denied, 271 Conn. 916, 859 A.2d 573 (2004).

[7] The defendant failed to object to the alleged improper statements during trial. "[I]n cases involving incidents of prosecutorial [impropriety] that were not objected to at trial . . . it is unnecessary for the defendant to seek to prevail under the specific requirements of [*State* v. *Golding*, supra, 213 Conn. 239–40], and, similarly, it is unnecessary for a reviewing court to apply the four-pronged *Golding* test. The reason for this is that the touchstone for appellate review of claims of prosecutorial [impropriety] is a determination of whether the defendant was deprived of his right to a fair trial, and this determination must involve the application of the factors set [forth] by this court in *State* v. *Williams*, 204 Conn. 523, 540, 529 A.2d 653 (1987)." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 313 Conn. 280.

[8] For clarity, the challenged portions of the prosecutor's closing argument are italicized. The prosecutor's comments, placed into context, were as follows. When addressing the defendant's interaction with emergency responders, the prosecutor stated: "So, it then begs the question, since they got limited information from [Gamble], how much information did they get from [the defendant]? *It makes perfect sense and [is a] logical inference that you can make that he gave them a lot of information.* He was the one who led them into [Gamble's] room." (Emphasis added.)

When addressing the defendant's actions while Gamble was in the shower, the prosecutor stated: "[The defendant] came up with the story of this whole nail polish remover, *so, he's going to make it look like there was nail polish remover and ashtrays and so forth in the room. Remember, he had the opportunity while she was burning* . . . there was a time when he wasn't in that room that leads you to believe what was he doing at the time when she's in there besides calling the cousin and saying, how do I get out of this jam." (Emphasis added.)

Subsequently, when discussing the liquid poured on Gamble, the prosecutor stated: "[Gamble] didn't actually see [the defendant] pour it, but she felt it, it was very wet to her skin, only her left side, on her arm and on her chest area. *And, again, although she didn't see it, she based that it was nail polish remover based on the smell.* She knows that her mom has used it in the past. And, obviously, the defendant told her, when we come up with a story, you got to say it was nail polish remover. And she made the assumption, obviously, it is nail polish remover." (Emphasis added.)

Finally, in addressing the defendant's mental state, the prosecutor stated, "So, with that, and plugging in [the defendant's] conduct, was he aware of the substantial and justifiable risk? Of course, he was. Again there was— of course, he was; *he knows it's flammable. He knows it's flammable. He poured it on her and got a flame. He took the time to go find it. The bottle says it's flammable. And he poured it on her for a reason.*" (Emphasis added.)

[9] The defendant's counsel stated the following during closing argument: "You know, it says right here, warning, extremely, extremely flammable. Liquid and vapors may ignite. Do not use when smoking."

[10] The prosecutor's comments were as follows. At the beginning of his rebuttal argument, the prosecutor stated: "See, the problem with [defense counsel's] argument is, all these maybes, maybes, maybes, or, or, or, that's all speculation. I mean, I can come up here and come up with a bunch of novel ideas of how it happened. But, again, you have to base your case or

your decision on the evidence. . . . Just to follow up on a few things relative to [defense counsel's] argument, *and I'm going to stick to the facts*." (Emphasis added.) The prosecutor then directly proceeded to address the defendant's argument about the motivation for Gamble's testimony.

As he was finishing his rebuttal, the prosecutor stated: "If you dropped a bottle of nail polish, it's going to be—it's going to fall away from you. If you're sitting down, it's going to fall in your lap. There's no injuries on [Gamble's] lap. *It's inconceivable what* [*defense counsel*] *is suggesting to you*. And all I ask you is that you do use common sense, which you're allowed to do in a case like this or in any criminal case." (Emphasis added.)

[11] Defense counsel stated as part of the end of his closing argument: "[Gamble's] mom had gone to Florida; that's when [the defendant] was over at the Gamble house. Did she want to tell her mom that? Did she want to tell her mom, I was excited, [the defendant] and I were going out, you know, maybe my nails were a little beat up from being a cashier, and maybe I wanted to dress up a little bit and maybe I was doing my nails, and maybe it was something I don't do normally, and maybe I did spill the nail polish remover."

Defense counsel continued: "So, maybe she did spill the nail polish remover. Maybe the medical records are correct; maybe she smokes occasionally. Maybe she smokes when her mom's not around because she's not really wanting to tell her mom about her smoking. Maybe she smokes around [the defendant]. And maybe she did drop the cigarette on herself after spilling the nail polish remover. Maybe it didn't require all that much to get her bra caught on fire."

[12] The prosecutor's full comment was as follows. When addressing why Gamble changed her story, the prosecutor stated, "It was only her and her mother living in the house at that time. But her mother testified that she was fearful. He had access to her keys, meaning [the defendant]. So, is it reasonable that she was fearful for the mother at the time, fearful for her own life, didn't want to swear out a warrant at the time when she's miles away from home and the mother's living alone in Hartford? *It makes perfect sense, ladies and gentlemen*." (Emphasis added.)

[13] When asking the jury to consider the defendant's theory that Gamble was lying, the prosecutor stated, "As I'm sure you're aware, and the judge is going to explain to you, that your verdict must be based on the evidence presented to you, not speculation, not guesses, but the evidence presented to you. But for now, I want you to ask yourselves, what evidence was presented to you that Tashawna Gamble had a motive to falsely accuse [the defendant] of this situation? What history of Tashawna Gamble was presented by the state to show she had a motive? What evidence was presented that Tashawna Gamble had an interest in the outcome of this case or that she had a prior bias toward this defendant prior to the offense? You saw her demeanor, you saw her manner while testifying. *Did she really seem like she was a spiteful person that would do this*?" (Emphasis added.)

[14] Defense counsel's full statement was as follows: "Ms. Gamble was sitting right there. You know that she had met with [the prosecutor]. I think it's fair to infer that they had gone over to some degree what her testimony might be. And [the prosecutor] asked her, in relationship to the time she got out of her ordeal of the hospital, asked her, how did you feel? Do you remember her answer? I felt betrayed. Oh, that could be because [the defendant] had lit her on fire."

Defense counsel then proceeded to argue that Gamble felt betrayed due to the alleged infidelity of the defendant.

[15] The prosecutor's full response during rebuttal was as follows: "Of course, we met, me and [Gamble], went over what her testimony was going to be. Okay? Do you think we suggested to her or script[ed] out what to say in a case like this? *She said she was betrayed. Really. She got . . . lit on fire by her boyfriend, and she felt betrayed. Was she supposed to say, '[w]ell, I felt good, I felt happy.' What else was she supposed to say?*" (Emphasis added.)

[16] We note, briefly, that it is not perfectly clear from the record whether Gamble testified on cross-examination that she met with the prosecutor, as asserted by defense counsel in his closing argument. Defense counsel's phrasing of the question in stating that "[y]ou told them earlier when you were talking with [the prosecutor] after you got out" lends itself to two interpretations: that either Gamble talked to the prosecutor after she got out of the hospital and stated that she felt betrayed, or she told the prosecutor earlier *during direct examination* that when she was discharged she felt betrayed. As defense counsel endorsed the first interpretation during closing

and has not challenged it on appeal, and because of our unwillingness to interpret ambiguities in the record in the light most harmful to the state, we consider the defendant's interpretation of the ambiguity. See *State* v. *Ciullo*, supra, 314 Conn. 48.

_____